Sara L. HUDSON, Plaintiff,

v.

NORFOLK SOUTHERN RAILWAY CO. and Norfolk Southern Corp., Defendants.

No. 1:99–CV–2287–JEC.

United States District Court, N.D. Georgia, Atlanta Division.

March 28, 2001.

Charles Winfred Tab Billingsley, Jr., Rose E. Goff, Greene Buckley Jones & McQueen, Atlanta, GA, for plaintiff.

Edward Scott Smith, Jeffrey D. Mokotoff, Ford & Harrison, Atlanta, GA, for defendants.

## *ORDER*

CARNES, District Judge.

This case is presently before the Court on defendant's Objections to Magistrate Judge's Report and Recommendation [26] and plaintiff's Objections to Magistrate Judge's Report and Recommendation [29]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that defendant's Objections to Magistrate Judge's Report and Recommendation [26] should be **SUSTAINED** and plaintiff's Objections to Magistrate Judge's Report and Recommendation [29] should be **OVERRULED**. The Court **ADOPTS** the Magistrate Judge's Report and Recommendation [25] as to all claims, except the retaliatory discipline claim. The Court **OVERRULES** the Report and Recommendation as to that claim and **GRANTS** defendant's motion for summary judgment on it, as well.

## *BACKGROUND*

Plaintiff alleges that her employer, Norfolk Southern Corporation (hereinafter "NS"), is liable to her under Title VII for (1) sexual harassment resulting in a hostile work environment, (2) discriminatory discharge, (3) discriminatory discipline, and (4) retaliation. After a thorough recitation of the facts,[1] Magistrate Judge Hagy concluded that plaintiff had failed to state a claim under Title VII for a hostile work

---

1. Because Magistrate Judge Hagy's Report and Recommendation contains a thorough recitation of the facts, they are not repeated here in great detail. Where the parties contend that Judge Hagy's understanding of the facts was erroneous, such facts are addressed below.

environment or for discrimination in the terms of her employment. (Mag. J.'s Rep. & Rec.[25].) As to the claim for retaliation, the magistrate judge concluded that plaintiff had failed to state a claim as to her discharge, but had sustained her burden in alleging retaliation in regard to the loss of her bonus and suspension in 1997. (*Id.* at 45–61.)

Both parties have filed objections to the Report and Recommendation. Defendant NS[2] argues that the magistrate judge erred in allowing to go forward the retaliation claim based on the loss of plaintiff's bonus and suspension. (Def.'s Objs. to Mag. J.'s Rep. & Rec. [26].) Plaintiff agues that the magistrate judge erred in dismissing her hostile work environment, sexual discrimination, and retaliatory discharge claims. (Pl.'s Objs. to Rep. & Rec. [29].) The Court addresses plaintiff's objections first, then defendant's.

## *DISCUSSION*

### I. Plaintiff's Objections

Plaintiff brings several objections to the magistrate judge's Report and Recommendation dismissing her sexual harassment and discrimination claims. (Pl.'s Objs. to Mag. J.'s Rep. & Rec. [29].) First, plaintiff argues that the magistrate judge erred in concluding that because much of Herren's abuse of female coworkers was not in plaintiff's presence, the environment was not hostile. (*Id.* at 3.) Second, plaintiff claims that the magistrate judge should have considered the behavior he classified as "boorish," predominantly the "silent treatment" behavior, in assessing the hostility of the environment. (*Id.* at 4.) Third, plaintiff claims that the magistrate judge was incorrect in concluding that the term

**2.** In his Report and Recommendation, the magistrate judge granted summary judgment on all counts to defendant Norfolk Southern Railway Co. on the ground that plaintiff had failed to establish an employment relationship

"bitch" was not a gender specific term. (*Id.* at 5–6.) Next, plaintiff objects to the magistrate judge's conclusion that much of Herren's behavior was attributable to a "personality conflict" between him and plaintiff rather than sexual discrimination. (*Id.* at 7.) Lastly, plaintiff claims that the magistrate judge erred in dismissing her retaliatory discharge claim. (*Id.* at 17.)

After a review of plaintiff's objections, this Court concludes that they are unfounded. The magistrate judge's Report and Recommendation addressed each of the issues contained in plaintiff's objections and rejected them. This Court agrees with the reasoning contained in the very thorough Report and Recommendation and concludes that the magistrate judge was correct to dismiss plaintiff's hostile work environment and discriminatory discharge claims. Accordingly, the Court **OVERRULES** plaintiff's objections and **AFFIRMS** the magistrate judge's Report and Recommendation as to these claims.

### II. Defendant's Objections

Having prevailed on its motion for summary judgment on all claims except one, defendant brings only one objection to the magistrate judge's Report and Recommendation—that the magistrate judge erred in allowing plaintiff's retaliatory discipline claim to go forward. (Def.'s Objs. to Mag. J.'s Rep. & Rec. [26].) In particular, defendant objects to the following conclusions:

(a) the Magistrate Judge's determination that a jury issue exists as to whether NS's legitimate non-discriminatory reason for suspending Plaintiff and elim-

between herself and Norfolk Southern Railway Co. Neither party disputes this ruling. Accordingly, any references to "defendant" in this Order refer solely to NS.

inating her bonus is pretextual. (R & R, p. 60).

(b) the Magistrate Judge's determination that Plaintiff's November 5, 1997 e-mail, combined with her subsequent meeting with Taylor, Holliday and Thomas, and her November 18, 1997 letter, constitutes protected opposition under Title VII (R & R, p. 48);

(c) the Magistrate Judge's determination that Plaintiff had a "good faith, reasonable belief" that NS engaged in unlawful discrimination (R & R, pp. 48–51); and

(d) the Magistrate Judge's determination that a causal connection existed between any protected activity and Plaintiff's suspension and bonus elimination. (R & R, pp. 53–54).

(*Id.* at 2.)

### III. Plaintiff's Retaliatory Discipline Claim

#### A. Background [3]

Plaintiff was employed by NS from 1974 until her termination on June 26, 1998. It appears that plaintiff had no problems at work until 1991, when she was disciplined for making a large number of personal photocopies on a NS copy machine. Plaintiff admitted to making the copies, but maintained that they were authorized. As a result of this incident, her bonus for that year was eliminated and she was issued a warning that any further instances of failing to tell the truth could result in stronger sanctions, including dismissal.

Around May 1995, plaintiff's title changed to systems coordinator in network support services. This position entailed shift work, either from 11 p.m. to 7 a.m., 3 p.m. till 11 p.m., or 7 a.m. till 3 p.m. Clyde "Buster" Herren was also a systems coordinator in network support services. Although Herren and plaintiff necessarily worked different shifts, they periodically encountered each other on shift changes when it was sometimes necessary to exchange information. Plaintiff states that, initially, she had no problems with Herren.

Plaintiff's next disciplinary episode occurred in August 1997. Herren filed a complaint against plaintiff alleging that she had made false statements about him to a co-worker, Kim Lyons.[4] Specifically, Herren alleged that plaintiff told Lyons that Herren had made a clandestine phone call to supervisor Taylor complaining that Lyons was late for work.[5] Plaintiff maintains that she never made such a statement to Lyons, but Lyons confirmed Herren's account. At a meeting held with plaintiff, Herren, Lyons, Taylor, and Don Holliday, NS's director of computer operations, plaintiff was told that a record of the meeting and a copy of Herren's complaint would be placed in her employment file, but that no further action would be taken provided there were no future incidents.

It was after this incident that the relationship between plaintiff and Herren began to sour. Plaintiff claims that Herren began to give her the "silent treatment" during shift changes and refused to answer her questions. Plaintiff alleges that she also became aware, through conversations with co-workers, that Herren used abusive language in the workplace. Plaintiff, however, only heard one such conversation directly, and this involved Herren

---

**3.** The facts below are taken from the Magistrate Judge's Report and Recommendation, as neither party has objected to his factual findings.

**4.** The complaint was filed with NS's manager of network support services, Alan Taylor, who

was the immediate supervisor for both Hudson and Herren.

**5.** Lyons had permission to be late to work that day.

making fun of gays. (Hudson Dep. at 78.) Plaintiff states that she also witnessed an incident in which Herren refused to speak to co-worker Connie Walden, who was relieving him on a shift change, and an incident in which Herren and co-worker Gary Joiner got in an argument over smoking.

Plaintiff first complained about Herren on November 5, 1997.[6] The basis for plaintiff's complaint was that she felt "threatened" by Herren. Management investigated the claim and concluded that the complaint was without merit. On November 18, 1997, plaintiff again wrote management, complaining about the outcome of the investigation and making further allegations regarding Herren's workplace behavior. Approximately a month later, management informed plaintiff that it had conducted a follow-up investigation and had found that there was no evidence that Herren had created an unsafe or hostile work environment. The letter also stated that, nonetheless, they had found that Herren had used racial and other inappropriate language in the workplace and that he would be disciplined accordingly.

The letter further stated that the investigation showed that plaintiff had not been completely forthright during the investigation. In response to this finding of untruthfulness, taken together with her past incidents of untruthfulness at work, NS suspended plaintiff for thirty days without pay and took away her annual bonus. The letter further noted that any future episodes of untruthfulness would result in termination.

In response to this action, plaintiff filed an EEOC complaint, alleging discrimination based on sex. Several months later, plaintiff allegedly assaulted a black co-worker, Denise Clark, who was annoying plaintiff by making noises while she, Clark, was eating an apple. Plaintiff jammed her fingers into Clark's jaw, causing substantial pain, according to Clark. Although plaintiff insisted that she had administered only a light touch that was meant to be reassuring to Clark, Clark indicated that the "touch" was forceful enough to cause her pain and to trigger an immediate trip to a doctor, as well as two subsequent medical visits and the use of pain medication. (Mag. J's Rep. & Rec. [25] at 9; Clark Dep. at 10–21; Ptf. Dep. at 136).

In investigating this incident, NS found that plaintiff had engaged in inappropriate behavior toward another employee. Plaintiff was dismissed as a result of the incident with Ms. Clark. Plaintiff then filed a second EEOC complaint, and later filed this lawsuit. As discussed above, the magistrate judge dismissed all of plaintiff's claims except for her claim of retaliatory discipline involving the December 1997 suspension and loss of bonus. That is the only claim discussed by the Court herein.

### B. Prima Facie Retaliation Claim Under Title VII

To make out a prima facie case of retaliation under Title VII, plaintiff must show that she "(1) engaged in protected opposition to Title VII discrimination or participated in a Title VII proceeding; (2) was disadvantaged by an action of the employer simultaneously with or subsequent to such opposition or participation; and (3) that there is a causal connection between the protected activity and the adverse employment action." *Morgan v. City of Jasper*, 959 F.2d 1542, 1547 (11th Cir.1992) (quoting *Whatley v. M.A.R.T.A.*, 632 F.2d 1325, 1328 (5th Cir.1980)). Once the plaintiff makes a prima facie showing,

---

6. The text of this complaint and the follow-up correspondences are provided below in sub- section B.

the burden shifts to the defendant to present evidence that it had a legitimate, non-discriminatory reason for terminating the plaintiff. If the defendant is able to put forth such a reason, the burden of going forward shifts again to the plaintiff, who must show that the reason put forth by defendant was a pretext for discrimination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The Court, therefore, must first decide if plaintiff has established a prima facie case of retaliation.

### C. Legal Standard for Statutorily Protected Activity

As an initial matter, the Court must decide if plaintiff engaged in statutorily protected activity. The Eleventh Circuit recognizes "two forms of statutorily protected conduct" under Title VII. *See Clover v. Total Sys. Servs., Inc.,* 176 F.3d 1346, 1350 (11th Cir.1999). "An employee is protected from discrimination if (1) 'he has opposed any practice made an unlawful employment practice by this subchapter' (the opposition clause) or (2) 'he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter' (the participation clause). 42 U.S.C. §§ 2000e-(3)a." *Id.*

#### 1. The Participation Clause

■ Regarding the participation clause, the *Clover* court stated that "although subchapter VI of chapter 21 of title 42 does not define the term 'investigation ... under this subchapter,' it is clear that, at a minimum, the term encompasses EEOC investigations of alleged unlawful discrimination." *Id.* at 1352–53. Noting that "Congress chose to protect employees who 'participate[ ] in *any* manner' in an EEOC investigation," the *Clover* court concluded that the participation clause encompassed the situation where an employee "participat[ed] in her employer's investigation in

response to an EEOC notice of charge of discrimination." *Id.* at 1353. The court declined to decide, however, whether "the participation clause extends to cover an employee's participation in an investigation conducted by her employer before receiving a notice of charge of discrimination from the EEOC." Because there is no evidence in this case that plaintiff participated in either an EEOC or internal investigation at the time she was disciplined in December 1997, the Court concludes that the participation clause is inapplicable. Plaintiff, therefore, must show that she engaged in protected conduct under the opposition clause.

#### 2. The Opposition Clause

■ As to the opposition clause, the *Clover* court reiterated that "an employee who seeks protection under the opposition clause must have a 'good faith, reasonable belief' that her employer has engaged in unlawful discrimination." *Id.* at 1351. The court elaborated, stating that "[t]he objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law." *Id.* And, although the conduct opposed need not "actually be [unlawful discrimination], ... it must be close enough to support an objectively reasonable belief that it is." *Id. See also Little v. United Techs., Carrier Transicold Div.,* 103 F.3d 956, 960 (11th Cir.1997) (In determining whether a plaintiff is engaged in statutorily protected activity, it is not necessary for the plaintiff to have "prove[d] the underlying conduct that [s]he opposed was actually unlawful in order to establish a prima facie case and overcome a motion for summary judgment." The plaintiff must show, however, that she "*subjectively* (that is, in good faith) believed that [her] employer was engaged in unlawful employment practices, [and] also that [her] belief was *objec-*

*tively* reasonable in light of the facts and record presented.") Therefore, it "is not enough for a plaintiff to allege that [her] belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable." *Id.*

### D. Did Plaintiff Have an Objectively Reasonable Belief that She Was Opposing an Unlawful Employment Practice of NS?

#### 1. Background

In her complaint, plaintiff alleges that she opposed an unlawful employment practice in a series of communications over a period from November 5 to November 25, 1997. The first communication was an e-mail sent by plaintiff to Holliday and Taylor in a November 5 e-mail. In totality, the e-mail states:

> On the occasions when I am alone on second shift and relieved by Buster Herren on third, may I please have a railroad police person or another IT employee present. Due to Buster's exhibition of hostility toward me, including refusing to speak or face me when I am giving him a report for turnover, I have become increasingly concerned for my safety. While this behavior is most likely only juvenile and unprofessional manifestations, I must be concerned as this behavior could escalate given Buster's reputed capacity for volatility and unpredictability.
>
> Serious consideration to my request would be appreciated.

(*See* Hudson Dep. at Ex. 12.) Nowhere does plaintiff's e-mail mention that she felt that she was being harassed by Herren on the basis of her sex. In fact, in her deposition, plaintiff admitted that her e-mail

did not contain these sorts of allegations because at the time, she "just wanted protection." (*Id.* at 120.) When asked in her deposition why she felt Herren was potentially dangerous, plaintiff stated that it was mainly because he gave her the "silent treatment" on shift changes, had gotten into a heated argument with Joiner, and had made comments that he wanted plaintiff to be fired. (Hudson Dep. at 99.) Plaintiff admits, however, that the bad feelings between her and Herren could have been because of the earlier incident involving Kim Lyons. (*Id.* at 102.) [7]

After receiving the e-mail, Taylor, Holliday, and Thomas requested a meeting with plaintiff to discuss her complaint. Plaintiff was unclear in her deposition about whether she made any specific allegations of harassment of minority groups in this meeting, but thought she probably had. (*Id.* at 120, 122.) She stated that she did tell the men that Herren would not speak to her and slammed things around, scaring her. (*Id.* at 107.) Plaintiff also states that she told them that co-workers Connie Walden, Kim Lyons, Gary Joiner, and Scott Pickard also felt threatened by Herren. (*Id.* at 108–09.) Plaintiff asserts that the relief she requested was to have another NS employee present at all times when she would otherwise be alone with Herren. (*Id.* at 110.)

After the meeting, Taylor apparently wrote a "file" memo recounting what occurred at this meeting. (Hudson Dep. at Ex. 13.) In this memo, there is no mention of allegations of discriminatory harassment. (*Id.*) Rather, the memo states that plaintiff had told the group that she feared for her physical safety while alone with Herren because of "(his) reputed capacity for volatility and unpredictabil-

---

**7.** As discussed below, plaintiff's November 5 complaint was investigated and found to be without foundation. (Hudson Dep. at Ex. 15.)

ity." (*Id.*) As plaintiff stated in her deposition, the memo states that plaintiff told the supervisors that Herren manifested hostility toward her by refusing to speak to her when she was giving a report at shift turnover and by slamming things around on the desk. (*Id.*) The memo also reflects that plaintiff named Lyons, Joiner, and Walden as employees who would also state that they felt threatened by Herren.[8] (*Id.*) The memo, however, states that when asked by the group what action could solve her problem, plaintiff supposedly said that she wanted Herren to speak to her and say "good morning" when he saw her.[9] (*Id.*) Plaintiff asserts that the reason this memo contained no references to Herren's "minority tirades" was that she had felt that Herren's statements had all been hearsay at that point, and she had told them the names of other employees who could actually confirm what Herren had said. (*Id.* at 121.)

After receiving a follow-up e-mail from Thomas regarding the November 6 meeting, plaintiff wrote Thomas a letter on November 18, 1997. (Hudson Dep. at Ex. 16.) In this letter, plaintiff expressed concern that her co-workers thought that her recent absence from work was due to "the office scuttlebutt" regarding her complaint about Herren, rather than her unrelated health issue.[10] The remainder of plaintiff's letter reads as follows:

> Unfortunately, but with respect, I cannot accept your assessment and resolution of my complaint, as outlined in your letter. Not only do I feel I have been treated with the **utmost** lack of dignity and professionalism by you and Messrs. Taylor and Holliday concerning this matter, I feel my concerns were unwelcome and ridiculed by all of you in our meeting as exhibited by your almost sneering attitudes. Not only were you not receptive and obviously biased, you were actively hostile to my concerns, and therefore I do not feel your "investigation" results have much validity.
>
> As stated, I will be returning to work, unless I hear otherwise. However, after receiving your letter, I feel even more strongly that I am returning to a hostile and offensive work environment and I do resent it. I feel you should be aware of my feelings, and that if I continue to have these feelings and encounter any further unprofessional behavior exhibited toward me upon my return, I will most certainly pursue this with a higher authority, and hopefully one that is less biased. Also for the record, upon my return to work, I certainly intend to perform my duties at Norfolk Southern with the same high degree of professionalism, expertise, and integrity as have I always in the past.

(*Id.*)

The last communication leading up to plaintiff's December 16 discipline is a letter she wrote to Taylor on November 25, stating that Herren had a reputation for being irrational, unprofessional, belligerent

---

8. As discussed with regard to the November 5 e-mail, plaintiff uses the term "threatened" loosely, as there is no evidence of actual physical threats or physically aggressive behavior, other than the argument with Joiner. Plaintiff stated in her deposition that Johnson, Joiner, and Pickard had all told her that they felt that she "was either in danger physically or with [her] job." (Hudson Dep. at 100.) When asked to provide details supporting this claim, however, all plaintiff could really recall was Johnson recounting that she had heard Herren and Taylor saying that they would "get" plaintiff. (*Id.*)

9. Plaintiff claims that this part of the memo is inaccurate because she "was past" wanting to be friendly with Herren. (*Id.* at 110.)

10. Plaintiff had been on leave since soon after the November 6 meeting.

and making tirades against minorities. (*Id.* at 126.) The letter reads:

I am deeply offended as a result of my finding it necessary to write you again concerning the "Mr. C.W. Herren, Jr." incident. Upon my returning to work today, I was approached by one of my co-workers who was under the apparent widespread assumption that my absence was related to their being questioned by Alan Taylor concerning Mr. Herren's past behavior. This co-worker, without any prompting or solicitation from me, confided her conversation with Mr. Taylor and the fact that he even called her back at home to reconfirm with her that her description of Buster's behavior as "very intimidating" was accurate. She gave the same account to Alan that I have heard from her before and others concerning Mr. Herren's behavior, which can only be described at best as inappropriate and at worst as threatening, repeated behavior patterns..... As I have known these people for quite some time and have always found them to be honest, unbiased, and decent people, I have great confidence that they will be willing to sign notarized statements testifying to Buster's reputation for irrational, unprofessional, belligerent tirades against minority groups, and his inappropriate behavior toward them resulting in a stressed and hostile working environment when he was present.

Jesse, this leaves me with the conclusion that only two possible scenarios could have existed at the time of your letter to me on November 12—either Alan had lied to you and your letter was in good faith, or both of you decided to ignore, misconstrue, or lie about the interviewees' declarations. However, either scenario leaves me with a personal dilemma. Even though I feel I have no professional future with Network Support Services at Norfolk Southern, I do feel a moral and personal obligation to pursue this matter as a result of my friendship with and respect for these co-workers. Would it be at all productive to discuss this with you again, even though I will not tolerate the hostile and harassing atmosphere to which I was exposed in the last meeting, before I proceed to a higher authority? I am willing to extend this courtesy to you, even though no such courtesies have ever been extended to me.

(*Id.* at Ex. 17.) In her deposition, plaintiff stated that she wrote this letter because "[n]umber 1, they had not done anything to rectify the situation with Herren, but it was mainly because of all the gossip that I was hearing." (*Id.* at 118.)

In response to plaintiff's November 25 letter, NS initiated another investigation of Herren's behavior. (*Id.*) NS wrote plaintiff on December 16, 1997, informing her that while the investigation did not reveal that Herren created an unsafe or hostile work environment, the investigation did show that he had used racial and other inappropriate language.[11] (*Id.* at 129.) This letter also stated that NS had found that plaintiff had not been completely forthright in the investigation and therefore was to lose her 1997 bonus and be suspended without pay for 30 days. (*Id.* at 131.)

### 2. *Discussion*

■ Taking all of these allegations in the light most favorable to plaintiff, the issue before the Court is whether plaintiff held an objectively reasonable belief that

---

**11.** As a disciplinary action for the use of inappropriate language, the defendant required Herren to undergo counseling, docked his annual bonus by $1,000, and warned him that future episodes could result in his dismissal. Following this disciplinary action, Herren moderated his behavior in the office. (Mag. J.'s Rep. & Rec. [25] at 8.)

she was objecting to an unlawful employment practice, which necessarily means that plaintiff had to have held an objectively reasonable belief that Herren's behavior amounted to illegal sexual harassment.[12] In making this determination, the Court considers the alleged harassment by Herren that plaintiff claimed to have been aware of at the time she complained to management. The allegations made by plaintiff fall into four categories: (1) racial comments, (2) comments about homosexuality, (3) comments and behavior based on gender, and (4) other comments.

As to race, plaintiff claims that Pickard told her at some point that he had heard Herren engage in "a tirade against minorities." (Hudson Dep. at 84–85.)[13] Plaintiff was uncertain, however, of when the comment was made and to whom it was made. While Johnson testified that she had heard Herren use the term "nigger," plaintiff did not state when she became aware of Herren's use of this slur.[14]

As to anti-gay comments, plaintiff claims that she personally overheard Herren make a derisive comment about homosexuals and tell some co-workers that he had once beat up a gay man. (Id. at 78–79.) Plaintiff also stated that Joiner, whom Herren believed to be gay, told her that he had made several complaints about Herren to Taylor and Holliday. (Id. at 101.) There was also an incident of which plaintiff was aware in which Joiner and Herren had an argument and Herren "almost assaulted" Joiner. (Id. at 99.)

As to comments and behavior based on gender, plaintiff claims that following the Kim Lyons incident, Herren often gave her the silent treatment during shift changes and would slam things on his desk in her presence. (Hudson Dep. at 107.) Plaintiff further claims that she once witnessed Herren giving co-worker Connie Walden the silent treatment, which caused Walden to become upset. (Id. at 80.) Plaintiff further testified in her deposition that she heard second-hand that Herren also gave other women the silent treatment and upset them. (Id. at 76.)

In addition, Herren accused Walden of lying about buying a new car. (Id. at 185.) Plaintiff states that Walden had also told her that she found Herren threatening. (Id. at 109.) Plaintiff stated that she had also had learned second-hand that Lyons found Herren to be intimidating. (Id.) Plaintiff also alleges that Johnson told plaintiff that she had overheard Herren talking to Taylor about getting plaintiff fired. (Id. at 84, 179.) Plaintiff further stated that either Johnson or Pickard told her that Herren had stated, some time prior to August 1997, that he hated all women and plaintiff was at the top of his list. (Id. at 85.)[15] In addition, it also appears that Johnson told plaintiff at some point prior to November 1997 that Herren had made negative comments about overweight women. (Id. at 128.)

Plaintiff also mentions several miscellaneous comments and acts as supporting

---

12. A second component of this inquiry is whether Herren's behavior could be imputed to NS. See Little v. United Techn., Carrier Transicold Div., 103 F.3d 956 (11th Cir.1997). As the Court concludes that plaintiff did not hold an objectively reasonable belief that the harassment was severe or pervasive, it need not reach this issue.

13. While plaintiff speaks of "tirades" in her pleadings, a thorough review of her deposition indicates that she was only told of one tirade heard by Pickard. (Hudson Dep. at 101.)

14. During the course of NS's investigation, Herren did in fact admit to using the term "nigger" in the office.

15. While this statement was not substantiated in discovery, in looking at a retaliation claim, the Court must consider the evidence as believed by plaintiff at the time she complained.

her discrimination claims. For example, plaintiff states that Herren talked about guns and his Marine Corps background on a regular basis. In addition, plaintiff states that Herren would practice martial arts in the office. Plaintiff apparently claims to have found this behavior frightening.

■ "To recover for retaliation, the plaintiff 'need not prove the underlying claim of discrimination which led to [his] protest;' however, the plaintiff must have a reasonable good faith belief that the discrimination existed." *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir.1997) (quoting *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989)). *See also Rollins v. Florida Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir.1989) ("[T]he statute shields an employee from retaliation regardless of the merits of her complaints so long as she can show a god faith reasonable belief that the challenged practices violated Title VII.") There are close cases where the underlying claim of discrimination fails but the retaliation claim survives. *See, e.g., Quinn v. Green Tree Credit Corp.*, 159 F.3d 759 (2d Cir.1998). This, however, is not one of those cases.

As discussed above, when an employee seeks protection under the opposition clause, he must put forth evidence that he had a "good faith, reasonable belief" that his employer was engaged in unlawful discrimination. *Clover*, 176 F.3d at 1351. This "reasonableness" has an objective component, which is measured against existing substantive law. *See id.; Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1388 n. 2 (11th Cir.1998) ("The plaintiffs also argue that when judging the reasonableness of their belief, we should not charge them with substantive knowledge of the law .... We reject plaintiffs' argument because it would eviscerate the objective component of our reasonableness inquiry. If plaintiffs are free to disclaim knowledge of the substantive law, the reasonableness inquiry becomes no more than speculation regarding their subjective knowledge.").[16] As discussed in greater

---

**16.** In determining whether plaintiff had an objectively reasonable belief that Herren was engaged in discriminatory behavior, the Court assumes that it is not necessarily fatal to plaintiff's claims that not all of the behavior was targeted at her. *See Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1522 (11th Cir. 1995). In addition, the Court also assumes that it may consider conduct that plaintiff did not witness first-hand, but that was later reported to her by others. *See id.; see also Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir.1997) ("The mere fact that [the employee] was not present when a racially derogatory comment was made will not render that comment irrelevant to his hostile work environment claim.").

Nonetheless, it is well-established that slurs and insults heard second-hand do not carry the same weight as those made directly to the plaintiff. *See, e.g., Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir.1997) (holding that fact that most comments were not made in front of plaintiff contributed to conclusion that they were "merely offensive" rather than objectively hostile); *Mitchell v. Carrier Corp.*, 954 F.Supp. 1568, 1577 (M.D.Ga.1995) (holding that severity of remarks was greatly diminished by fact plaintiff learned of them second-hand).

Also important is the fact that plaintiff has to show that she knew of the behavior at the time she complained, as one cannot oppose behavior of which one is not aware. *See Clover*, 176 F.3d at 1352 ("[W]hat counts is only the conduct that person opposed, which cannot be more than what she was aware of."). Accordingly, in regard to her retaliation claim, the Court discusses only that allegedly discriminatory conduct of which plaintiff claimed to have been aware at the time she complained in November. While other conduct discovered later may have been relevant to plaintiff's underlying harassment claim, it is not relevant to the retaliation claim. Nonetheless, the Court has reviewed all of the evidence and concludes that even if plaintiff claimed to have been aware of all of the

detail below, the Court concludes that plaintiff's belief was not objectively reasonable.

■ This Court agrees with the magistrate judge that a significant difference between the objective reasonableness standard for a retaliation claim and that for the underlying discrimination claim lies in the time at which the reasonableness of plaintiff's belief is assessed. In reviewing a retaliation claim, the Court must consider the evidence available to plaintiff at the time she expressed her opposition and not consider new facts developed in discovery. The magistrate judge found this distinction to be determinative in the present case, holding that at the time plaintiff complained, Herren's conduct appeared more egregious than it played out to be in discovery. While this may be so, this Court nevertheless concludes that the evidence known by plaintiff at the time she complained to NS was insufficient to support a reasonable belief in a hostile work environment.

As to the racial comments allegedly made by Herren, the Court notes that plaintiff's discrimination claim was based solely on gender, not race. While the Court recognizes the holding of *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir.2000), that remarks targeting other minorities may contribute to the overall hostility of a working environment, this Court does not agree that evidence of race discrimination can be used to support a claim of sex discrimination. In *Cruz*, where a Hispanic, female plaintiff alleged race discrimination, one of the issues was whether it was appropriate for the court to consider racially derogatory comments made about black employees as well. The Second Circuit concluded that such comments were relevant to plaintiff's claim of a racially hostile work environment. Nothing in

*Cruz*, however, indicates that evidence of derogatory comments based on race could be used to support a claim of sex discrimination. Accordingly, for racial comments to be pertinent, the Court concludes that plaintiff must be alleging that she was opposing not only a hostile work environment based on sex, but also a hostile work environment based on race.

The problem with such a claim is that nowhere does plaintiff allege that the racially derogatory comments were made in front of minority employees, nor does she allege that the employees who heard the comments felt that Herren was making their working environment intolerable. As mentioned above, plaintiff herself never heard Herren make these comments. Although plaintiff would have the Court believe that Herren made regular tirades against minorities, in her deposition, she mentions only one tirade of which she was told by Pickard. Although Johnson testified in her deposition that she heard Herren make a few racist remarks, plaintiff has not stated whether she was aware of these remarks at the time she complained in November 1997.

■ Even if plaintiff were aware of the remarks overheard by Johnson, these allegations do not result in more than isolated incidents, which come nowhere close to being actionable. *See Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982) ("the mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee 'does not rise to a Title VII violation.' For harassment to state a claim under Title VII, it must be sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment.") *See also Edwards,* 49 F.3d at 1521 ("[T]he racial slurs allegedly

alleged acts of harassment that came to light during discovery, it would not change the

outcome of the Court's decision regarding the retaliation claim.

spoken by co-workers had to be so 'commonplace, overt and denigrating that they created an atmosphere charged with racial hostility.' ") (quoting *E.E.O.C. v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068 (11th Cir.1990)); *Walker v. Ford Motor Co.*, 684 F.2d 1355, 1359 (11th Cir.1982). In *Edwards*, the court stated that "[i]n deciding whether a hostile work environment was created factors to consider include the frequency of the discriminatory conduct, whether the conduct is threatening or humiliating, and whether the conduct unreasonably interferes with the plaintiff's performance at work." 49 F.3d at 1521–22.

Plaintiff simply has not presented evidence that the racially derogatory comments allegedly made by Herren were sufficiently severe or pervasive to create a hostile work environment. In fact, as she and Herren did not even work together and only occasionally passed each other on shift changes, she has not demonstrated how Herren's behavior even affected her work environment. The mere complaint by a white woman that she "heard through the grapevine" that a co-worker was making negative remarks against blacks does not constitute opposition to an unlawful employment practice.[17] Accordingly, the Court concludes that plaintiff's belief that she was complaining of race discrimination was not held in objective good faith and could not form the basis of her retaliation claim.

Regarding the "gay comments," as discussed in the Report and Recommendation, sexual orientation is not a classification protected under Title VII. *See Hamner v. St. Vincent Hosp. and Health Care Ctr., Inc.*, 224 F.3d 701,

705 (7th Cir.2000). Accordingly, although plaintiff may have found Herren's behavior offensive, because it is not illegal under Title VII to discriminate against homosexuals, these comments cannot provide the basis of a discrimination claim. In addition, because it is clear under the law that Herren's alleged behavior, if true, was not illegal, these allegations provide no support for plaintiff's claim that she had a good faith belief that she was opposing an unlawful employment practice.

As to Herren's interest in guns and martial arts, and other comments not based on a protected class of persons, there can be no claim. As discussed in the Report and Recommendation, these and other "boorish" comments allegedly made by Herren have no place under Title VII law, as Title VII specifically prohibits only that discrimination based on "race, color, religion, sex, or national origin." Although behavior need not be sexual in nature to support a claim of hostile work environment based on gender, the behavior must be based on gender, *Curde v. Xytel Corp.*, 912 F.Supp. 335, 341 (N.D.Ill.1995), and there is no evidence that this conduct was. Title VII is not meant to be a " 'general civility code' " and cannot give life to these statements that are unrelated to a protected class. *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 571 (11th Cir.2000).

Accordingly, if plaintiff held a good faith belief that Herren was engaged in unlawful discrimination, it could only have been on the basis of his comments and actions toward women. Although the magistrate judge found that the evidence was insufficient to support a claim for sex discrimina-

---

**17.** The Court notes the irony in plaintiff's allegation that she was opposing a hostile racial environment created by Herren. At most, Herren made some racially derogatory comments of which black employees were not even aware. Plaintiff, on the other hand, was alleged to have actually assaulted a black employee for making noises while chewing. Given a choice between the two, the Court assumes that most employees would view Herren's conduct as less hostile than plaintiff's.

tion, he concluded that it was objectively reasonable for plaintiff to have believed in November 1997 that she had been discriminated against on the basis of her gender. (Mag. J.'s Rep. & Rec. [25] at 49.) The magistrate judge based this finding on the fact that plaintiff believed that Herren had stated that he hated all women and plaintiff was at the top of his list and that Herren gave plaintiff and other female employees the silent treatment. This Court concludes, however, that these allegations are simply insufficient to support an objectively reasonable belief in discrimination.

First, the Court concludes that these incidents were neither severe or pervasive enough for plaintiff to have reasonably felt that Herren had created a hostile work environment based on gender. The Court adopts the magistrate judge's conclusion that neither Herren's disbelief that Walden had purchased a Corvette, Herren's wish that plaintiff would be fired, nor Herren's comments about overweight women constituted harassment. (Mag. J.'s Rep. & Rec. [26] at 24.) Further, the Court concludes that Herren's alleged "silent treatment" [18] toward plaintiff and other female co-workers did not constitute sexual harassment in violation of Title VII.[19] In short, examining Herren's conduct for its

frequency and severity, as well as whether it was physically threatening or unreasonably interfered with plaintiff's or another employee's job performance, the Court concludes that Herren's behavior did not even approach actionable sexual harassment. *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir.1999) (citing with approval cases in which courts concluded that conduct fell short of sexual harassment).

Second, plaintiff has come woefully short of demonstrating a reasonable belief that she, herself, encountered a hostile work environment as a result of Herren's conduct. Indeed, most of plaintiff's knowledge about Herren's conduct was gained second-hand by plaintiff through the office grapevine.[20] In fact, it appears that plaintiff actually had very little interaction with Herren. In her deposition, she stated that she "avoided him as much as possible" and that they rarely worked the same shift. (*Id.* at 81.) It seems that she only saw Herren for a brief period of time during shift changes. While Herren's silence during these shift changes may have been uncomfortable, any belief by plaintiff that a few moments of awkward silence with a co-worker constituted a hostile work environment was not an objectively reasonable belief.

**18.** Plaintiff's complaint about this alleged "silent treatment" put the employer in a quandary. That is, plaintiff found most of Herren's comments, as reported to her by others, to be so distasteful that she repeatedly complained about them to management. At the same time, when Herren said nothing, plaintiff complained about his silence. Most prudent employers would encourage a tactless or crude employee to err on the side of silence, rather than giving offense with his remarks. Perhaps plaintiff found Herren's reported remarks and his silence ill-mannered and simply wanted Herren to be nice to her. As stated above, however, Title VII is not a civility code, and it is not the Court's place to get involved in interpersonal employee disputes.

**19.** Title VII does not prohibit "harassment" in and of itself. Rather, demonstrating a "hostile work environment" based upon a protected class is one way in which a plaintiff can put forth a claim of sex discrimination. Title VII, however, certainly does not prohibit all behavior an employee may find to be unpleasant or annoying.

**20.** Another component of a hostile environment is the unwelcomeness of the conduct. To the extent that plaintiff was not directly aware of much of Herren's conduct and sought out information about his remarks from others, the unwelcomeness prong is diminished.

Finally, even if plaintiff could reasonably belief that Herren's behavior was severe enough to create a hostile work environment for plaintiff or others, she could not have held a reasonable belief that Herren's conduct was based on gender, which is a prerequisite for a claim of sexual harassment. Indeed, harassment is not a free-standing tort; instead, it becomes actionable only if the harassment is motivated by the gender of the victim. As to other employees, the record shows that Herren was disagreeable to both men and women. As to plaintiff, alone, the Court agrees with the magistrate judge that Herren's alleged comment that he hated plaintiff was not based on her sex. (*Id.*) (Mag. J.'s Rep. & Rec. [26] at 24.) As noted in the earlier recitation of facts, the discord between plaintiff and Herren began, not as a gender feud, but originated as a result of plaintiff's false accusation of Herren regarding Kim Lyons. *Supra* at 1306. Herren thereafter viewed plaintiff with distrust. The evidence, however, shows only that there was personal animosity between plaintiff and Herren, not that Herren was pursuing a vendetta against plaintiff because of her sex.

Indeed, Herren could just as well have complained that plaintiff had created a hostile environment for him, by virtue of her constant gathering of intelligence against him in an effort to get him fired and talking about him behind his back with co-workers. Yet, such a claim by Herren would fail for the same reason that plaintiff's claim must fall: plaintiff's hostility toward Herren was based on her dislike of him, not his gender. Similarly, were plaintiff's claim viable, Denise Clark would arguably have both a racial and sexual harassment claim, as Clark is both black

and female, and as plaintiff allegedly assaulted Clark while she was chewing an apple in a noisy manner. Plaintiff's answer to such a charge would likely be that any animus she bore to Clark was personal, not racial or sexual: [21] a response that Herren could likewise make on this record.

Having decided that plaintiff's belief that Herren sexually harassed her by creating a hostile work environment was an objectively unreasonable belief, the Court concludes that plaintiff's November 18 letter could not constitute an objection to an illegal employment practice. Reiterating that a plaintiff need not be able to prove the underlying discrimination claim in order to state a claim for retaliation, the Court concludes that in the present case, the behavior about which plaintiff complained came nowhere near actionable sexual harassment and plaintiff's belief that it was sexual harassment was simply not reasonable. Accordingly, plaintiff has failed to state a retaliation claim based on the November 18 letter. Having failed to establish a prima facie case of retaliation, there is no need to examine whether defendant's proffered explanation for disciplining plaintiff was legitimate. Plaintiff's retaliatory discipline claim therefore fails as a matter of law.

Accordingly, the Court **SUSTAINS** defendant's objections, **OVERRULES** that part of the magistrate judge's Report and Recommendation addressing this claim, and **GRANTS** defendant's motion for summary judgment on the retaliatory discipline claim.

*CONCLUSION*

For the foregoing reasons, the Court overrules plaintiff's objections [29] and

---

**21.** Plaintiff has responded to Clark's allegation by indicating that the latter was a "troublemaker," an "opportunist," and "very cognizant of racial issues," as borne out by the fact that Clark had previously filed an EEOC charge. (Ptf's Dep. at 145). In point of fact, Clark testified that she had never filed a charge with the EEOC. (Clark Dep. at 30.)

sustains defendant's objections [26] to the Magistrate Judge's Report and Recommendation [25]. The Court otherwise **ADOPTS** the Magistrate Judge's Report and Recommendation [25] as to all claims except the retaliatory discipline claim. As this Order grants defendant's motion for summary judgment in its entirety, the Clerk is directed to close this action.

### REPORT AND RECOMMENDATION IN AN EMPLOYMENT DISCRIMINATION ACTION

HAGY, United States Magistrate Judge.

Plaintiff filed the above-styled civil action on September 7, 1999. She claims that Defendant discriminated against her on the basis of sex, subjected her to sexual harassment, and retaliated against her, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*

The action is presently before the Court on Defendant's Motion for Summary Judgment [15]. For the reasons discussed below, the undersigned **RECOMMENDS** that Defendant's Motion be **GRANTED IN PART** and **DENIED IN PART**, and that judgment be entered in favor of Defendant Norfolk Southern Corporation on Counts One and Two of Plaintiff's complaint, and in favor of Defendant Norfolk Southern Railway Co. on all counts of Plaintiff's complaint.

### I. BACKGROUND FACTS [1]

Until her termination on June 26, 1998, Plaintiff had been employed by Norfolk Southern Corporation (hereinafter, "NS") at least since 1974.[2] She began her employment as a system coordinator in the information services group. Ptf. SMF at 1. In or about 1979, she was promoted to the position of supervisor in computer network operations in the information technology department of NS.

In 1991, Plaintiff was accused by her then-supervisor, R.F. Tritt, of making a large number of personal copies on an NS copy machine and of lying about having had approval to do so. Although Plaintiff admitted to making between one hundred and one thousand personal copies, she continues to insist that her use of the copier was authorized. Ptf. SMF at 3. As a result of this incident, Plaintiff's annual bonus for that year was eliminated and she was issued a letter warning her that further unauthorized use of NS equipment and supplies, or further instances of failure to tell the truth, could result in stronger sanctions including dismissal.

In or about May 1995, Plaintiff's title changed to systems coordinator in network

---

1. Unless otherwise indicated, the Court draws the undisputed facts from Defendant's "Statement of Material Facts as to which There is No Genuine Issue" ("SMF"). If, however, Plaintiff has disputed a specific fact and pointed to evidence in the record supporting her version of events, the Court has viewed all evidence and factual inferences in the light most favorable to Plaintiff, as required on a defendant's motion for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *McCabe v. Sharrett*, 12 F.3d 1558, 1560 (11th Cir.1994); *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir.1993). Accordingly, the facts as stated by the Court are either not disputed or are viewed in the light most favorable to Plaintiff.

2. Plaintiff contends she began her employment with NS in 1971. Ptf. SMF at 1. Defendant maintains that Plaintiff's employment began "in or about 1974." Def. SMF at 1. This disagreement may reflect some period of time Plaintiff worked for a predecessor company, Southern Railway. For purposes of this claim, the Court finds the difference immaterial. Further, Plaintiff has not disputed Defendants' claim that her employer at all relevant times was NS rather than its parent company and co-defendant, Norfolk Southern Railway Co. ("the railway").

support services. In that capacity, she frequently worked alone on the third shift, which covered the period from 11 p.m. to 7 a.m., but she also at times worked on both the second shift, which lasted from 3 p.m. until 11 p.m., and the first shift, which lasted from 7 a.m. to 3 p.m. Ptf. Dep. at 40, 57. Plaintiff, who is diabetic, preferred working the third shift, but had been advised by a doctor to avoid that shift because of her health. When Plaintiff was not working the third shift, it was instead staffed by Clyde "Buster" Herren, who held the same rank as Plaintiff. Although they did not regularly work together on the same shift, Plaintiff periodically encountered and was required to exchange information with Herren during shift changes.

In August 1997, Herren filed a complaint with NS's manager of network support services, Alan Taylor, alleging that Hudson had made false statements about Herren to a co-worker, Kim Lyons. Taylor was the immediate supervisor for both Hudson and Herren. The complaint alleged that Hudson had falsely told Lyons that Herren made a clandestine phone call to Taylor complaining that Lyons (who had permission to be absent) was late for work. Lyons gave a written statement confirming Herren's account. Plaintiff insisted at that time, and maintains today, that she did not make any such statement to Lyons. A meeting to discuss the matter was convened, involving Plaintiff, Lyons, Taylor and Don Holliday, NS director of computer operations. Plaintiff was told that a record of the meeting and a copy of the Herren complaint would be placed in her personnel file, but that no further action would be taken provided that there were no future incidents. Following this incident, relations between Hudson and Herren soured. Herren began giving Hudson the "silent treatment" during shift changes, refusing to acknowledge her

questions or volunteer information to her. Ptf. Dep. at 88, 107–08.

Hudson became aware through conversation with co-workers of a number of instances in which Herren used abusive language at work. Although Hudson had heard from other NS employees of Herren making such statements on several occasions, the only instance she observed first-hand was a conversation between Herren and a co-worker, Dee Tomlin, during which Herren made several anti-gay remarks and mockingly imitated a gay co-worker. Ptf. Dep. at 78. Plaintiff also witnessed another incident in which Herren refused to speak to or answer questions from another co-worker, Connie Walden, when Walden was relieving him during a shift change, which caused Walden to become upset. Ptf. SMF at 10, Walden Dep. at 8–10. Plaintiff also learned from co-workers of an incident during the summer of 1997 in which Herren and another NS employee, Gary Joiner, had a heated confrontation over Herren's habit of smoking in the office with the windows open. Ptf. SMF at 19–21.

On November 5, 1997, Plaintiff sent an e-mail to Taylor and Holliday in which she requested a railroad police escort during shift changes when she was alone and Herren was relieving her. In the e-mail, Plaintiff stated that she had "become increasingly concerned for [her] safety" because of Herren's "hostility." Further, she stated that she was concerned that Herren's behavior could escalate into violence "given [Herren's] reputed capacity for volatility and unpredictability."

The e-mail message resulted in a meeting on November 6, 1997, involving Plaintiff, Taylor, Holliday, and Jesse Thomas, an NS assistant vice president. At the meeting, Plaintiff told these supervisors that other employees in the department— Kim Lyons, Gary Joiner and Connie Wal-

den—also felt threatened by Herren and would confirm her account. As a result of the meeting, Thomas ordered an investigation into Plaintiff's allegations. Taylor conducted the investigation.

Thomas wrote to Plaintiff on November 12, 1997, reporting that management's investigation found "no merit to [her] allegations of inappropriate behavior." The letter advised Plaintiff that her e-mail account of her dealings with Herren was inaccurate, and that there were "material discrepancies and contradictions" between the e-mail, her personal account at the November 6 meeting, and the statements of other employee witnesses. The letter went on to warn that "an employee who makes unsupported charges could be subject to disciplinary action."

Plaintiff wrote to Thomas on November 18, 1997, rejecting the conclusions of the investigation as invalid, and stating that she considered her work environment to be "hostile and offensive(.)" Plaintiff followed this letter with another letter to Thomas on November 25, 1997. Plaintiff related that several co-workers had told her about their interviews with Taylor, and that their accounts of Herren's conduct corroborated Plaintiff's version. She stated that she believed these co-workers would sign sworn statements attesting to Herren's "reputation for irrational, unprofessional, belligerent tirades against minority groups, and his inappropriate behavior toward them resulting in a stressed and hostile working environment(.)" Plaintiff indicated that she intended to pursue her complaint with a higher authority at NS.

Responding to this letter, NS management decided to conduct a further investigation, in which Taylor was not involved, headed by Shari Cohen, a personnel officer in the Virginia Beach home office of NS. Cohen's interviews with NS employees confirmed that Herren used racial and anti-gay slurs, that several employees felt discomfort in working around Herren, and that Herren made hostile remarks about Hudson. In his interview, Herren acknowledged having used the slurs "nigger" and "fucking faggot" in conversations at work.

Thomas notified Plaintiff by letter dated December 16, 1997, that NS management had concluded its follow-up investigation. The letter stated that "(a)lthough there was no evidence indicating Mr. Herren had created an unsafe or hostile work environment, the investigation did reveal that Mr. Herren had used racial and other inappropriate language in the workplace(.)" The letter promised that "appropriate action" would be taken. Thomas further advised Plaintiff, however, that she was being suspended for thirty days without pay, effective immediately, and that her annual bonus for 1997 would be eliminated because "the investigation also revealed that you were not completely forthright during the course of the investigation." The letter cited three specific instances of false statements Plaintiff was alleged to have made to investigators: that a co-worker, Bill Hutto, offered to accompany Plaintiff to the office when she relieved Herren; that Walden thanked Plaintiff for bringing Herren's conduct to the attention of management; and that Lyons felt uncomfortable around Herren. In addition to these alleged false statements, the letter referred to the 1991 copier episode and the August 1997 Herren complaint as prior "disciplinary notations" about dishonesty. The letter concluded that any further episode of untruthfulness would result in dismissal.

Plaintiff responded to the suspension and loss of her bonus by filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on January 7, 1998. The complaint alleged that Defendant discriminated against her

by disciplining her because of her sex, and retaliated against her for complaining about discrimination. *See* Def. Ex. 22 (attached to Deposition of Plaintiff).

For his admitted use of profanity and for making disparaging remarks about co-workers, Herren underwent a "counseling session" with Thomas on January 5, 1998, and was docked fifty percent of his annual bonus for 1997. Ptf. Ex. 8 (attached to Thomas Dep.). Further, he was warned that future episodes of improper behavior could result in stronger sanctions, including dismissal. The lost bonus amounted to about $1,000. Herren Dep. at 74. Following this disciplinary action, Herren moderated his behavior in the office. *See* Ptf. Dep. at 130–31; Joiner Dep. at 37; Walden Dep. at 47.

On or about June 24, 1998, Plaintiff became involved in a disagreement in the office with a co-worker, Denise Clark, over Plaintiff's displeasure with noises Clark was making while eating an apple. During this conversation, Plaintiff touched Clark on the face. Although Plaintiff maintains that the contact was merely a light touch meant to be reassuring, Ptf. SMF at 27, Clark sent an e-mail complaint to her supervisor, Sherry Partain, alleging that Plaintiff had "jammed" her fingers into Clark's upper jaw, causing substantial pain. Partain reported this complaint to Thomas, who called Plaintiff and Clark to his office seeking an explanation. Plaintiff acknowledged during this meeting that she touched Clark, but denied that the contact could have been forceful enough to cause injury. Nevertheless, Clark made two trips to the doctor to receive pain medicine. She sent a memo to Thomas on June 26, 1998, complaining that she continued to experience pain.

Plaintiff was dismissed on June 26, 1998. In the dismissal letter, Thomas informed Plaintiff that she was being terminated for "conduct unbecoming an employee of Nor-folk Southern Corporation" because she engaged in "unacceptable activities" toward a fellow employee, a reference to the touching incident with Clark. *See* Def. Ex. 21 (attached to Deposition of Plaintiff). Defendants were aware of Plaintiff's January 7, 1998, EEOC charge when they made the decision to terminate her. Cohen Dep. at 76.

Plaintiff filed an additional charge with the EEOC on October 2, 1998, alleging Defendant unlawfully discriminated against her on the basis of sex and in retaliation for complaining about discrimination by dismissing her. *See* Def. Ex. 23 (attached to Deposition of Plaintiff). She alleges that she received a right to sue notice from the EEOC on June 9, 1999, and timely filed this action within ninety (90) days thereafter. *See* Def. Ex. 27 (attached to Deposition of Plaintiff).

Because many of the Court's findings of fact are intertwined with its analysis of whether the parties have met their respective evidentiary burdens, the remaining relevant facts are set forth in the Discussion below.

## II. *DISCUSSION*

### 1. *SUMMARY JUDGMENT STANDARD*

Summary judgment is authorized when all "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 175, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Bingham, Ltd. v. United States,* 724 F.2d 921, 924 (11th Cir.1984). The movant car-

ries this burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). In making its determination, the court must view the evidence and all factual inferences in the light most favorable to the nonmoving party.

Once the moving party has adequately supported its motion, the nonmoving party must come forward with specific facts that demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The nonmoving party is required "to go beyond the pleadings" and to present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. Generally, "[t]he mere existence of a scintilla of evidence" supporting the nonmoving party's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

When considering motions for summary judgment, the court does not make decisions as to the merits of disputed factual issues. *See Anderson*, 477 U.S. at 249, 106 S.Ct. 2505; *Ryder Int'l Corp. v. First American Nat'l Bank*, 943 F.2d 1521, 1523 (11th Cir.1991). Rather, the court only determines whether there are genuine issues of material fact to be tried. Applicable substantive law identifies those facts that are material and those that are irrelevant. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Disputed facts that do not resolve or affect the outcome of a suit will not properly preclude the entry of summary judgment. *Id.*

If a fact is found to be material, the court must also consider the genuineness of the alleged factual dispute. *Id.* An issue

is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 250, 106 S.Ct. 2505. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 242, 106 S.Ct. 2505. Moreover, for factual issues to be genuine, they must have a real basis in the record. *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. 1348. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587, 106 S.Ct. 1348 (quoting *First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). Thus, the standard for summary judgment mirrors that for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259, 106 S.Ct. 2505.

## 2. STANDARDS OF PROOF IN TITLE VII CLAIMS

Title VII of the Civil Rights Act of 1964 provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). To prevail on a Title VII claim, a plaintiff must prove that the defendant acted with discriminatory intent. *Hawkins v. Ceco Corp.*, 883 F.2d 977, 980–981 (11th Cir.1989); *Clark v. Huntsville City Bd. of Educ.*, 717 F.2d 525, 529 (11th Cir.1983). Such discriminatory intent may be established either by direct

evidence of discriminatory intent or by circumstantial evidence meeting the four-pronged test set out for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also Holifield v. Reno*, 115 F.3d 1555, 1561–62 (11th Cir.1997); *Nix v. WLCY Radio/Rahall Comm.*, 738 F.2d 1181, 1184 (11th Cir.1984).

Direct evidence is defined as "evidence, which if believed, proves existence of fact in issue without inference or presumption." Black's Law Dictionary 413 (6th ed.1990); *see also Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1226 (11th Cir.1993); *Carter v. City of Miami*, 870 F.2d 578, 581–82 (11th Cir.1989); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n. 6 (11th Cir.1987). Evidence that merely "suggests discrimination, leaving the trier of fact to infer discrimination based on the evidence" is, by definition, circumstantial. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081–82 (11th Cir.1990).

Because direct evidence of discrimination is seldom available, a plaintiff must typically rely on circumstantial evidence to prove discriminatory intent, using the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See Holifield v. Reno*, 115 F.3d 1555, 1561–62 (11th Cir.1997); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527–1528 (11th Cir.1997). Under this framework, a plaintiff is first required to create an inference of discriminatory intent, and thus carries the initial burden of establishing a *prima facie* case [3] of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *see also Jones v. Bessemer Carraway Med. Ctr.*,

137 F.3d 1306, 1310, *reh'g denied and opinion superseded in part*, 151 F.3d 1321 (11th Cir.1998); *Combs*, 106 F.3d at 1527.

Demonstrating a *prima facie* case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination. *Jones*, 137 F.3d at 1310–1311; *Holifield*, 115 F.3d at 1562 (citations omitted); *see Burdine*, 450 U.S. at 253–54, 101 S.Ct. at 1093–94. Once the plaintiff establishes a *prima facie* case, the defendant must "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Jones*, 137 F.3d at 1310. This burden is "exceedingly light" in comparison to the burden required if the plaintiff has presented direct evidence of discrimination. *Smith v. Horner*, 839 F.2d 1530, 1537 (11th Cir.1988). If the defendant is able to carry this burden and explain its rationale, the plaintiff, in order to prevail, must then show that the proffered reason is merely a pretext for discrimination. *See Burdine*, 450 U.S. at 253–54, 101 S.Ct. at 1093–94; *Perryman v. Johnson Products Co.*, 698 F.2d 1138, 1142 (11th Cir.1983).

A plaintiff is entitled to survive a defendant's motion for summary judgment if there is sufficient evidence to demonstrate the existence of a genuine issue of material fact regarding the truth of the employer's proffered reasons for its actions. *Combs*, 106 F.3d at 1529. A *prima facie* case along with sufficient evidence to reject the employer's explanation is all that is needed to permit a finding of intentional discrimination. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502,

---

**3.** The phrase *"prima facie* case" in the context of a Title VII case denotes the establishment of a legally mandatory, rebuttable presumption. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 n. 7, 101 S.Ct. 1089, 1097 n. 7, 67 L.Ed.2d 207 (1981).

511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993); *Combs,* 106 F.3d at 1529.

### 3. *CLAIMS AGAINST NORFOLK SOUTHERN RAILWAY CO.*

In her complaint, Plaintiff named both Norfolk Southern Railway Co. (NSRC) and Norfolk Southern Corporation (NS) as defendants, and alleged that she was employed by both companies. Defendant maintains that Plaintiff was, at all times, employed only by NS and never by NSRC. Plaintiff has not attempted in her briefs to connect NSRC to any of the adverse actions taken against her, or otherwise to respond to Defendant's denial that NSRC is a proper party.[4] When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned. *Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir.1995); *see also Bute v. Schuller International Inc.,* 998 F.Supp. 1473, 1477 (N.D.Ga.1998). Therefore, Defendant NSRC is entitled to summary judgment on all counts of Plaintiff's complaint.

### 4. *PLAINTIFF'S TITLE VII CLAIMS*

#### 1. *Hostile Work Environment*

 An employer is liable for a violation of Title VII based on sexual harassment when the harassing conduct "unreasonably interferes with an employee's job performance by creating a hostile, intimidating, or offensive work environment." *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). To establish a *prima facie* case for a Title VII claim against an employer for a hostile

work environment based on sexual harassment, a plaintiff must show that: 1) she belongs to a protected group; 2) she was subjected to unwelcome sexual harassment; 3) the harassment was based on sex; 4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment; and 5) there is a basis for holding the employer liable for the harassment either directly or indirectly. *See Cross v. Alabama,* 49 F.3d 1490, 1504 (11th Cir.1995); *Henson v. City of Dundee,* 682 F.2d 897, 903–905 (11th Cir. 1982); *see also Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Industries v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

 To show that the harassment is "based on sex," Plaintiff need not show that the comments complained of are explicitly sexual in nature. Rather, so long as Plaintiff's working conditions have been discriminatorily altered because of her gender, Title VII is implicated. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 25, 114 S.Ct. 367, 372, 126 L.Ed.2d 295 (1993) (Scalia, J., concurring); *Carr v. Allison Gas Turbine Div., General Motors Corp.,* 32 F.3d 1007, 1009 (7th Cir.1994). Conversely, workplace banter does not automatically constitute unlawful harassment just because the words used have a sexual connotation or sexual content. "The critical issue, Title VII's test indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Svcs. Inc.,* 523 U.S. 75,

---

4. Courts may look beyond the nominal independence of two entities and treat two ostensibly separate businesses as a single employer for purposes of a Title VII claim. *Lyes v. City of Riviera Beach, Florida,* 166 F.3d 1332, 1341 (11th Cir.1999). Plaintiff has failed to

introduce any facts, however, from which this Court could deduce that NS and NSRC were so highly integrated, or operated so closely in concert, that both should be regarded as Plaintiff's employer.

80, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998) (citations omitted).

■ To establish that the harassment affected a condition of her employment, Plaintiff must show that the Defendant's actions were so severe or pervasive that they altered the conditions of the workplace, creating an objectively abusive and hostile atmosphere. *Harris*, 510 U.S. at 21, 114 S.Ct. at 370; *Gupta v. Florida Board of Regents*, 212 F.3d 571, 582–83 (11th Cir.2000). For example, racial slurs allegedly spoken by co-workers must be so "commonplace, overt and denigrating that they created an atmosphere charged with racial hostility." *EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068 (11th Cir. 1990); *see also Bolden v. PRC, Inc.*, 43 F.3d 545, 551 (10th Cir.1994) ("instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments" to constitute hostile environment). In deciding whether a hostile environment was created, a court must look at all of the circumstances, including the frequency of the discriminatory conduct, the severity of the discriminatory conduct, whether the conduct is threatening or humiliating, and whether the conduct unreasonably interferes with the plaintiff's performance at work. *Harris*, 510 U.S. at 23, 114 S.Ct. at 372; *Gupta*, 212 F.3d at 584. As the Supreme Court has stated, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998) (citation omitted).

■ Plaintiff has identified numerous statements and actions by Herren that are alleged to have contributed to a hostile work environment. Plaintiff acknowl-edges, however, that she had only limited first-hand exposure to any of these statements or acts. Plaintiff has first-hand knowledge of the following incidents: (1) on repeated occasions following their August 1997 run-in involving Kim Lyons' absence, Herren gave Plaintiff the "silent treatment" during shift changes, refusing to answer questions or otherwise engage in ordinary office conversation; (2) on one occasion, which Plaintiff cannot place in time, Plaintiff overheard Herren talking derisively in the office about homosexuals and doing a mocking imitation of a co-worker he believed to be gay, followed by a series of comments in which Plaintiff understood Herren to be talking about beating up a gay man; and (3) on one occasion, which Plaintiff also cannot place in time, Plaintiff saw Herren giving the "silent treatment" to another co-worker, Connie Walden, which caused Walden to become upset.

The bulk of Plaintiff's case rests on episodes relayed to her by co-workers and said to be based on those co-workers' personal knowledge. The allegations are that Herren: (1) routinely remarked that he hated women and particularly Plaintiff; (2) used the term "nigger" in office conversation in reference to blacks; (3) made anti-Semitic remarks while at work;[5] (4) stated that he planned to "clean up" his workplace, which meant ridding it of blacks and women; (5) talked of physical violence against homosexuals; (6) was rude to co-worker Connie Walden on several occasions, including once when he accused her of lying about purchasing a new Corvette, and another in which he referred to her as "stupid" after a disagreement about their attitudes toward drug abuse; (7) told a co-worker that he hated Plaintiff's guts and

---

5. The allegation of anti-Semitic comments, while contained in Plaintiff's complaint, is not supported by any evidence in the record and appears to have been abandoned. Therefore, it will not be considered further here.

would "get her"; (8) told co-worker Jo Ann Johnson that Plaintiff was a "bitch," crazy, and could be dangerous, but would not be with the railroad much longer; (9) got into a disagreement with co-worker Gary Joiner about Herren's habit of smoking in the office with the windows open that nearly escalated into violence; (10) made a limp-wristed gesture to mock Joiner's homosexuality during a conversation with supervisor Taylor over the open-window controversy; (11) called Plaintiff, outside her presence, a "lying bitch" and said he hated her during an August 1997 tirade in the office that was overheard by co-worker Scott Pickard; (12) gave the impression of a violent propensity due to his constant talk about guns and his Marine Corps background, and his ritual of practicing martial-arts moves in the office; (13) made insulting remarks about obese women, including a reference to an overweight female co-worker as "thunder thighs"; and (14) regularly used the term "faggot" to refer to gays and told insulting jokes about gays while at work.[6]

It is not fatal to Plaintiff's claim that most of the remarks attributed to Herren were not targeted at her. A plaintiff may have a viable hostile work environment claim under Title VII even if the remarks were not directed at her. *Edwards v. Wallace Community College*, 49 F.3d 1517, 1522 (11th Cir.1995) *citing Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir.

1991). Even remarks that were not directed at the protected class to which Plaintiff belongs (here, women) may be considered in evaluating the overall level of workplace harassment. Remarks targeting members of other minorities may contribute to the overall hostility of the working environment for a minority employee. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2nd Cir.2000); *see also Pospicil v. Buying Office, Inc.*, 71 F.Supp.2d 1346, 1357 (N.D.Ga.1999) (Plaintiff may make out claim by showing the existence of other conduct, not expressly involving her, intentionally designed to create an abusive or hostile work environment, which was designed to demean and minimize her importance in the workplace).

Moreover, Plaintiff may support a claim of hostile work environment by the use of harassing conduct she learned of through hearsay, so long as she was aware of the harassing incidents at the relevant time at which she alleges she experienced the hostile environment. *See Carter v. Chrysler Corp.*, 173 F.3d 693, 701 (8th Cir.1999) (hostile work environment claimant may introduce evidence of offensive mens' room graffiti she learned about through hearsay during her employ, even though she had never been inside the men's room); *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2nd Cir.1997) (allowing use of eight hearsay incidents of racially offensive re-

---

**6.** Sexual orientation is not a classification that is protected under Title VII; thus homosexuals are not members of a protected class under the law. *Hamner v. St. Vincent Hosp. and Health Care Ctr., Inc.*, 224 F.3d 701, 705 (7th Cir.2000). Therefore, although the comments and conduct ascribed to Herren, if true, are no doubt offensive and inappropriate in the workplace, they may not be used to establish a Title VII discrimination claim.

Additionally, the Court finds unpersuasive any allegation that the confrontation over smoking between Joiner and Herren was motivated by Herren's anti-gay animus and thus

is evidence of discrimination. Even if homosexuality were a protected class, the act of smoking a cigarette and opening a window is not an offense directed against one particular co-worker; Plaintiff does not allege, for instance, that Herren blew smoke directly at Joiner or only lit a cigarette when Joiner entered the room. Further, the smoking incident supplies no evidence that Herren was violent, given Joiner's testimony that it was he who confronted Herren, not the other way around, and that Herren's only response was laughter. *See* Joiner Dep. at 57–59.

marks made outside Plaintiff's presence to be considered in hostile work environment claim, because "the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment").

The incidents alleged by Plaintiff, viewed in their entirety and accepted as true, as they must be at this stage of the litigation, leave no doubt that Herren was a boorish and unpleasant co-worker. Title VII, however, does not guarantee an environment free of such irritants. The Court finds that Herren's conduct falls short of the severity and pervasiveness required to establish harassment altering the conditions of the workplace.

Certain of the incidents cited by Plaintiff simply do not constitute actionable harassment at all. For instance, it is not harassment for a co-worker to practice karate moves that are not directed at anyone, or to talk about his military background or his interest in guns. Likewise, it is not harassment for a co-worker to express disbelief as to which car a co-worker has purchased, or to have an argument with a co-worker over exposing one's children to illegal drugs. It is not harassment to predict that a co-worker will not be with the company much longer; when voiced by a non-supervisor, this falls into the category of wishful thinking rather than actionable threat. And it is not actionable harassment, though it may be impolite, to call a co-worker "thunder thighs"; Title VII outlaws discrimination based on "race, color, religion, sex, or national origin," 42 U.S.C. § 2000e–2(a), but it is silent as to weight.

As the Eleventh Circuit recently reiterated, "[i]nnocuous statements or conduct, or boorish ones that do not relate to" a plaintiff's protected class "are not counted [in determining if the plaintiff was subjected to a hostile work environment]. Title VII, as it has been aptly observed, is not a 'general civility code.'" *Gupta,* 212 F.3d at 571.

Another subset of the incidents attributed to Herren, while undoubtedly directed at Plaintiff and undoubtedly upsetting to her, likewise fall short of unlawful harassment because they are not "based on sex." These include Herren's hearsay statements that he hated Plaintiff, and that Plaintiff was a liar and was "crazy," as well as the "silent treatment" adopted toward Plaintiff and toward another female co-worker. Although Plaintiff claimed that Herren prefaced the "hate" remark with "I hate all women," that account is based on hearsay only, and the first-hand accounts proffered by Plaintiff fail to support her version.[7] To the contrary, the record shows that Herren singled out certain targets—male as well as female—for abuse, apparently based on personal dislike rather than gender, while other targets, male and female, were immune. *See* Joiner Dep. at 11 ("(Herren) had this very narrow outlook of the world in general and people. If you do not fall within the parameters in which he operates in his world, you're nobody, you're just scum... I'm already on the record as stating that he does that equally to males and females in my opinion."). A mere personality clash among co-workers, no matter how severe,

---

7. Plaintiff testified that either Jo Ann Johnson or Scott Pickard relayed the "I hate all women" statement to her. Ptf. Dep. at 85. Neither Johnson nor Pickard, however, testified to having heard such a remark. The closest facsimile that can be gleaned from the record is Pickard's recollection that Herren once told him, in reference to Plaintiff, "(T)hat lying bitch, I hate her." Pickard Dep. at 8. Rather than buttressing Plaintiff's claim that Herren exhibited bias against all women, this version of the comment further leads the Court to conclude that Herren merely disliked Plaintiff because of personal friction between them. *See infra* at 1329.

is not grounds for a Title VII discrimination complaint. *See Hawkins v. Ceco Corp.*, 883 F.2d 977, 986 (11th Cir.1989) (manager's personal dislike of employee is not evidence of illegal discrimination); *McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir.1986) (finding no actionable discrimination where female postal worker was singled out for disproportionately harsh punishment, because severity was based on "personal feud" with supervisor rather than gender); *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1406 (10th Cir.1997) (animus or favoritism by supervisor that is not shown to be related to Plaintiff's membership in protected class is not evidence of discrimination); *Morrison v. Carleton Woolen Mills, Inc.*, 108 F.3d 429, 441 (1st Cir.1997) ("Merely because a supervisor is overbearing or fellow employees unsociable and hard to get along with, does not suffice unless underlying motives of a sexual or gender discriminatory nature are implicated.").

This winnowing process still leaves a third subset of remarks attributed to Herren that Plaintiff alleges to have been based on membership in a protected class. These include: using the term "nigger" in office conversation; stating that he planned to "clean up" his workplace, which Plaintiff interpreted as meaning to rid the workplace of blacks and women; and calling Plaintiff a "bitch" in at least two conversations with co-workers.

Some courts have found that the term "bitch" is a gender-based insult that may give rise to an inference of discrimination based on sex. *See Carter v. Chrysler Corp.*, 173 F.3d 693, 700 (8th Cir.1999); *Burns v. McGregor Electronic Indus., Inc.*, 989 F.2d 959, 964 (8th Cir.1993). Others, however, say no automatic inference arises that a co-worker who uses the term "bitch" is motivated by gender rather than by personal dislike unrelated to gender. *Galloway v. General Motors Svc.*

*Parts Op'ns*, 78 F.3d 1164, 1168 (7th Cir. 1996) (male co-worker's conduct in calling a female coworker a "sick bitch" and remarking "suck this, bitch" while making an obscene gesture found not to be sex—or gender-related). Because of the larger context of the remarks at issue here, this Court finds the reasoning of *Galloway* more persuasive.

Defendant has introduced evidence, which Plaintiff does not deny, that Herren regularly used a similarly vulgar term, "dumb sonofabitch," to refer to male co-workers. *See* Joiner Dep. at 59 (dumb sonofabitch is "one of (Herren's) favorite sayings"). While Herren may have varied his terminology depending on the gender of the target, it is difficult to see a qualitative difference in these insults rising to the level of discriminatory treatment. The Seventh Circuit, positing a hypothetical situation similar to the facts here, came to the same conclusion in *Galloway*:

> If (Defendant) had called (Plaintiff) a "sick woman," and a similarly situated male coworker a "sick man," there would be no ground for an inference of sex discrimination. And, likewise, were there a similarly situated male worker to (Plaintiff) who (Defendant) called a "sick bastard" while calling her a "sick bitch," we do not think it would be rational for a trier of fact to infer that (Defendant) was making the workplace more uncongenial for women than for men.

*Galloway*, 78 F.3d at 1168. The undisputed evidence here is that Herren directed his name-calling to men and women alike. Evidence that the workplace is a "highly volatile and frequently unpleasant place to work for both men and women" does not support a claim for sex discrimination. *Aramburu*, 112 F.3d at 1408, *citing Lowe v. Angelo's Italian Foods, Inc.*, 87 F.3d 1170, 1176 (10th Cir.1996).

Most significantly, Plaintiff acknowledges that the acts of harassment directed at her personally—Herren's "silent treatment" and his use of the term "bitch" to describe her to co-workers—closely followed the August 1997 disagreement over whether Herren had turned in Kim Lyons for being absent. Until then, Plaintiff concedes, her relations with Herren had been professional and even cordial; after that, relations were "nonexistent." Plaintiff Dep. at 107–08; *see also* Herren Dep. at 38 (Herren believed that Plaintiff "should be fired" for the Lyons episode). The conclusion is inescapable that Herren singled out Plaintiff for abuse not because she was a woman but because of a personal and individual conflict.[8]

The Court next turns to the comment Plaintiff cites regarding Herren's intent to "clean up" the office. The Court finds this remark meaningless toward proving the existence of a hostile work environment absent some contextual clue to support Plaintiff's discriminatory interpretation. The record is bereft of such context. Rather, all of the evidence in the record suggests that the remark had an innocuous meaning. First, witness R. Gary Joiner, who testified that he heard Herren make a statement to this effect, interpreted the remark as meaning that Herren planned to impose his personal management style, rather than as evidencing a plan to drive off minorities:

(T)hat was Mr. Herren's belief, that he and Alan Taylor together could clean up that office. . . . in dealing with computer systems, there's usually more than one way to solve a problem. Usually there's a general way everybody thinks is the accepted way to do it. And pretty much cut and dry, Buster thought his way was the best. And it wasn't always the best. But, you know, personally I think he had a problem with people—if you were sick, not coming to work and things (like) this, I think he—you know, if you were out sick a couple of days if you had a cold or flu or something, I think maybe he thought this was a weakness of some sort.

Joiner Dep. at 26–27. Second, when Herren was asked to explain a similar statement he made in a memo to his superiors (Ptf.Ex. 6) that advocated purging his department of "guest" workers, he furnished a nondiscriminatory explanation—that "guests" referred to workers borrowed from other departments during a staffing shortage. Herren Dep. at 63. Plaintiff has adduced no evidence that her interpretation of "clean up" is more plausible than any number of possible nondiscriminatory meanings. Therefore, this statement is not probative of discriminatory hostility.[9]

As to the anti-black remarks attributed to Herren, the Court finds that Plaintiff has failed to show more than an isolated use of racial slurs. While offensive, this type of conduct by a co-worker—particu-

---

8. There is also evidence in the record that both Plaintiff and Herren coveted the position as third-shift supervisor, which Plaintiff generally occupied until health problems intervened. *See* Walden Dep. at 32 ("In fact, you know, I think a lot of the animosity between Sara and Buster started because he wanted the third shift and she had it."). This rivalry further demonstrates that the hostility Herren exhibited toward Plaintiff was directed toward her as an individual, rather than women as a class.

9. For an illustration of the importance of context when a plaintiff complains of a statement that is ambiguous and capable of a non-harassing interpretation, *see Mendoza v. Borden, Inc.*, 195 F.3d 1238 (11th Cir.1999) (summary judgment for employer in sexual harassment suit was proper where co-worker's disputed comment, "I'm getting fired up, too," was susceptible to innocent interpretation and no contextual cues supported Plaintiff's sexually charged interpretation).

larly where, as here, the remarks appear to be of a general nature rather than condemnation of a specific individual to his or her face—does not, as a matter of law, rise to the level of creating a hostile work environment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998) (mere utterance of a racial epithet does not sufficiently alter the terms and conditions of employment so as to violate Title VII); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986) (co-worker's mere utterance of a statement that "engenders offensive feelings in an employee" would not affect the conditions of employment sufficiently to violate Title VII).

On occasion, courts have held that nonstop use of abusive language, even unaccompanied by touching or other conduct that escalates the harassment, can be enough to sustain a complaint. *See, e.g., Frazier v. Smith*, 12 F.Supp.2d 1362, 1370 (S.D.Ga.1998) ("repeated barrage of racially offensive remarks," including some addressed directly to Plaintiff's face, suffice to overcome motion for summary judgment on hostile work environment claim). The prevailing view, however, appears to be that mere insults by non-supervisors are insufficient to support a claim of hostile work environment absent some aggravating factor, such as physically intimidat-

ing conduct accompanying the slurs. *See, e.g., Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 571 (2nd Cir.2000) (fact that co-worker not only "constantly made racially derogatory remarks," but also frequently backed Plaintiff against a wall while leering at her, "brings this case over the line separating merely offensive or boorish conduct from actionable harassment").

Wherever the exact boundary lies between a sporadic and non-actionable irritation versus persistent and actionable harassment, this Court is persuaded that Plaintiff's claim falls on the side of the former. Her complaint is fatally flawed because she fails to differentiate repetitive office gossip about the same conduct from repeated and distinct incidents of conduct. Without such a distinction, this Court cannot conclude from the record at hand that Herren's racist statements were truly pervasive as opposed to merely isolated.[10] This illustrates a weakness that infects any complaint relying primarily on hearsay from co-workers—the same few incidents, repeated in the echo chamber of a small workplace, may be magnified into the proverbial "federal case." *See Edwards v. Wallace Community College*, 49 F.3d 1517, 1522 (11th Cir.1995) (Plaintiff may not sustain complaint of hostile work environment on the basis of "statements said to have been made to third parties by fourth parties" where record fails to show when the

---

**10.** Plaintiff's complaint and her brief in opposition to summary judgment allege that Herren was guilty of multiple "tirades" and "steady streams of abusive conduct" against women and blacks. Complaint at ¶ 16; Ptf. Brf. at 7. The record as developed during discovery, however, sheds no light on whether Herren's racial remarks were in fact frequent. For instance, Joiner testifies that Herren "called (Thomas) the company nigger." Joiner Dep. at 14. He does not state, however, whether Herren called Thomas this offensive name once, or whether it was a regular occurrence.

Because of the imprecision with which Plaintiff has pled her case, it is impossible for the Court to determine whether certain allegations refer to the same episode of conduct or to distinct episodes. For example, Plaintiff's Statement of Disputed Material Facts is ambiguous as to whether Pickard reported two "tirades" to Plaintiff or only one. Ptf. SMF at ¶ 22, 23. Her deposition makes clear, however, that there was only a single "tirade." Ptf. Dep. at 101. Because the pervasiveness of the harasser's conduct is a central element to the case, Plaintiff's counsel should be on notice that creating confusion is not the same as creating an issue of material fact.

statements were made, how knowledge of them was acquired, and when Plaintiff learned of them). While repeatedly hearing about the same episodes no doubt contributed to Plaintiff's subjective feeling that the level of harassment was pervasive, an employer cannot be held liable because employees frighten each other by retelling the same few horror stories.[11]

Under the analytic framework laid out by the Supreme Court, courts must look not only at the severity and frequency of any allegedly harassing conduct, but also at whether the conduct was "physically threatening or humiliating, as opposed to merely offensive," and whether it "unreasonably interfere(d) with the claimant's performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993). Plaintiff has failed to satisfy either of these showings. The uncontradicted evidence is that Herren never said or did anything threatening or violent toward Plaintiff. While Plaintiff told her employer that she feared Herren because of his "reputed capacity for volatility and unpredictability," her anxiety appears to be largely a product of her own belief that people who work in gun shops, practice martial arts, and talk about their Marine Corps service are dangerous, rather than on anything Herren said or did to her. Further, Plaintiff nowhere alleges

that Herren's conduct unreasonably interfered with her ability to do her job. Although Herren's "silent treatment" may have made work less enjoyable, Plaintiff does not allege that Herren withheld information vital to her effectiveness.

Plaintiff relies on the factually analogous case of *Curde v. Xytel Corp.*, 912 F.Supp. 335 (N.D.Ill.1995), to argue that, once Plaintiff has shown even a limited amount of gender-based harassing conduct, other annoyances that are not based on sex may then "piggyback" onto the sexual harassment for purposes of proving that the work environment was hostile. The Court agrees with this proposition, but finds it inapplicable here. Plaintiff has failed to show that any of the abuse she endured was based on her gender. Plaintiff has pointed the Court to no authority—and the Court knows of none—for the principle that a sexual harassment claimant may prevail without showing she was the victim of *any* sex-based conduct. *See O'Shea v. Yellow Technology Svcs., Inc.*, 185 F.3d 1093 (10th Cir.1999) (facially neutral abusive conduct can support finding of hostile work environment sexual harassment when viewed in the context of other, overtly gender-based abuse).[12]

In summary, because no reasonable person could find that the acts alleged by

---

11. Although, as this Court has noted, a plaintiff need not hear or see every incident of harassing conduct in order for that incident to "count" toward establishing the level of workplace hostility, it is well established that slurs and insults heard second-hand do not carry the same severity as those made to the employee's face. The fact that Plaintiff's case so extensively rests on conduct related to her by others further mitigates against a finding that her workplace environment was objectively hostile. *See, e.g., Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir.1997) (where most of sex-based comments overheard in meetings were not directed at Plaintiff, conduct was "merely offensive" and not hostile); *Mitchell v. Carrier Corp.*, 954 F.Supp.

1568, 1577 (M.D.Ga.1995) (even though racist statement was intended to refer to Plaintiff, severity is diminished because Plaintiff did not hear remark and only found out later from co-worker).

12. *Curde* is also distinguishable from this case because the Plaintiff there was subjected not just to verbal abuse but to unwelcome touching. The *Curde* court explicitly relied on the physical contact, plus the fact that the statements complained of were threatening as opposed to merely profane or abusive, to distinguish *Curde* from other harassment cases holding that verbal abuse alone could not support a hostile work environment claim. *See id.* at 341, n. 8.

Plaintiff were either severe or pervasive so as to alter the terms or conditions of employment, Plaintiff has failed to establish a *prima facie* hostile environment claim. *Mendoza*, 195 F.3d at 1244 ("A motion for judgment as a matter of law will be denied only if 'reasonable and fairminded persons might reach different conclusions.'") (citation omitted).

### 2. *Discriminatory Discharge*

#### 1. *Prima Facie* Case

■ Where an employee is discharged as a disciplinary measure for violation of a rule or policy of her employer, the Eleventh Circuit modifies the traditional *prima facie* case elements that apply to a complaint alleging discriminatory discharge. In a discriminatory discipline case that results in discharge, to establish a *prima facie* case a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the job from which she was discharged, and (3) the misconduct for which she was discharged was nearly identical to that engaged in by an employee outside the protected class whom the employer disciplined less harshly. *Nix v. WLCY Radio/Rahall Comm'n*, 738 F.2d 1181, 1185 (11th Cir.1984).

■ Plaintiff has produced evidence satisfying the first two elements of *Nix*. As a woman, she is a member of a protected class, and she has presented evidence that she was qualified for her job, a point Defendant does not dispute. Therefore, the inquiry becomes whether any similarly situated male employee was retained when charged with misconduct similar to that for which Plaintiff ostensibly was dismissed. To make this comparison, Plaintiff must identify an employee outside of her protected class to which she is "similarly situated in all relevant respects." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997). If a plaintiff fails to show the existence of a similarly situated em-

ployee, summary judgment is appropriate where no other evidence of discrimination is present. *Id.*

The record reflects that Plaintiff was discharged as a result of a complaint lodged by a co-worker, Denise Clark, who claimed Plaintiff injured her by poking her in the face during a disagreement. The only comparator employee Plaintiff has offered is a "Mr. Jones," whom she testified was not terminated after having broken a female co-worker's ribs by squeezing her abruptly. Ptf. Dep. at 150–51. Plaintiff has not introduced any admissible evidence, however, to document this proffered comparator incident. To be considered by the Court at the summary judgment stage, supporting affidavits must be based on personal knowledge and set forth evidence that would be admissible at trial. Fed. R.Civ.P. 56(e). Plaintiff testified only that she had heard of the Jones incident; she claims no first-hand knowledge, and thus her account would not be admissible at trial. *See Shumway v. United Parcel Svc., Inc.*, 118 F.3d 60, 64–65 (2nd Cir.1997) (Plaintiff cannot satisfy requirement of showing "similarly situated" comparators with her own conclusory statements that are based on "common knowledge" rather than personal observation).

Even if this single incident were found to be a proper and admissible comparator, Plaintiff's claim still would fail because she has not alleged that Jones had any prior disciplinary history similar to her record of warnings for dishonesty. Therefore, this purported comparator employee is not "similarly situated." *See Maniccia v. Brown*, 171 F.3d 1364, 1369 (11th Cir.1999) (employee who was fired after four policy violations cannot compare her treatment to that of former co-workers who each committed only one violation); *see also Wall v. National R.R. Passenger Corp.*, 718 F.2d 906, 909 (9th Cir.1983) ("When warranted

by the circumstances, an employer may discipline repeat offenders more severely than first-time offenders."). A plaintiff's employment record is relevant to determining whether his proffered comparator employees are in fact similarly situated. Even where the Plaintiff identifies a comparator who committed a similar disciplinary infraction, that co-worker is not similarly situated if Plaintiff has a history of deficient performance and the comparator is not alleged to have such a record. *See Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1312–13 (11th Cir.1998) (employees who both came to work unprepared were not similarly situated for purposes of Title VII discriminatory discipline claim, where Plaintiff had a record of other deficiencies, and no evidence showed the comparator had a similar history). An employer is within his rights to fire a troublesome employee over a minor offense that he might overlook in a model employee; the latest offense may be the proverbial "straw that broke the camel's back." *Dhyne v. Meiners Thriftway, Inc.*, 184 F.3d 983, 989 (8th Cir.1999).

Therefore, Plaintiff has not carried her burden of creating a *prima facie* case. Even if she were able to surmount this hurdle, however, the Court finds that Defendant still would be entitled to summary judgment as to Plaintiff's dismissal, because Defendant has presented a legitimate, nondiscriminatory reason for the disciplinary action, which Plaintiff has failed to rebut as pretextual.

### 2. Defendants' Legitimate Non-Discriminatory Reason

■ Defendant has presented sufficient evidence of a legitimate, non-discriminatory reason for Plaintiff's termination so as to rebut a *prima facie* case. There is no dispute that, if Defendant truly believed that an employee assaulted and injured a co-worker, this would constitute legitimate grounds for dismissal. *See, e.g.,* *Johnson v. Hondo, Inc.*, 125 F.3d 408, (7th Cir.1997) (firing of employee shortly after he filed sexual harassment complaint was not pretextual, where employer showed that employee violated rule by fighting with co-worker).

Accordingly, Defendant has presented evidence of a legitimate, non-discriminatory reason for Plaintiff's termination. Under the *McDonnell Douglas* framework, the burden thus shifts to Plaintiff to present evidence that Defendant's proffered reason was a mere pretext for unlawful discrimination.

### 3. Pretext

■ Plaintiff may carry her burden of showing that the employer's proffered reasons are pretextual by showing that they have no basis in fact, that they were not the true factors motivating the decision, or that the stated reasons were insufficient to motivate the decision. Plaintiff can either directly persuade the court that a discriminatory reason more likely motivated the employer or show indirectly that the employer's ultimate justification is not believable. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981) (citation omitted); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1522 (11th Cir. 1991). In other words, the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825.

Plaintiff attempts to show that the employer's stated basis for her dismissal—the "face-mooshing" incident with Denise

Clark—was pretextual, by introducing doubt as to the genuineness of Clark's claimed injury. *See* Plaintiff Dep. at 135–38; Johnson Dep. at 18; Joiner Dep. at 32–33, 46, 54. How badly Clark may or may not have been hurt, however, is not the issue. The inquiry at the summary judgment stage is not whether the employee committed the infractions, but whether the employer had a good-faith belief that the grounds for which the employee was punished were legitimate. "That the employee did not in fact engage in misconduct reported to the employer is irrelevant to the question whether the employer believed the employee had done wrong." *Hawkins v. Ceco Corp.*, 883 F.2d 977, 980 n. 2 (11th Cir.1989); *see also Smith v. Papp Clinic, P.A.*, 808 F.2d 1449, 1452–53 (11th Cir.1987) ("[I]f the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not 'because of race'").

Plaintiff has introduced no evidence that Defendant did not believe Clark's complaint that Plaintiff touched her in a painful and unwelcome manner. Rather, all of the evidence indicates that a reasonable employer in Defendant's position would have taken Clark's complaint seriously: she filed a written statement documenting the incident shortly after it happened; Plaintiff admitted to all of the essential details of the confrontation (except for the force with which she touched Clark); and Clark was advised by a doctor to take pain-killers for her injury. There is no evidence that Clark had a history of lying so as to put the employer on notice that she was not credible. Moreover, Plaintiff suggests no motive for which Clark would have fabricated her claim of injury, or conspired with Defendant to concoct the injury as a pretext on which to dismiss Plaintiff.

Because a plaintiff bears the burden of establishing that a defendant's reasons are a pretext for discrimination, a plaintiff "must present 'significantly probative' evidence on the issue to avoid summary judgment." *Young v. General Foods Corp.*, 840 F.2d 825, 829 (11th Cir.1988) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25, 106 S.Ct. 2548, 2552–2554, 91 L.Ed.2d 265 (1986)). "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [a defendant] has offered extensive evidence of legitimate, non-discriminatory reasons for its actions." *Young*, 840 F.2d at 830.

### 3. *Discriminatory Discipline*

■ Along with her claim of discriminatory discharge, Plaintiff also contends that she was the victim of unlawful discipline due to discrimination in the way her complaints about Herren's conduct were handled, culminating in the November 1997 decision to suspend her and take away her yearly bonus. To make out a violation of Title VII, a plaintiff first must show that she has suffered an adverse employment action. An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee. *Gupta*, 212 F.3d at 587 (citation and internal marks omitted). There is no dispute that the loss of a bonus and a thirty-day unpaid suspension constitute adverse employment action, as discussed in more detail *infra* at 51–52. Plaintiff has cited no authority, however, for her contention that an employer's refusal to conduct a satisfactory investigation into harassment charges constitutes adverse employment action. Recent case law sug-

gests the contrary. *See Bailey v. Henderson,* 94 F.Supp.2d 68 (D.D.C.2000) (supervisor's failure to follow protocol and intercede upon receipt of Plaintiff's complaint of sexual harassment by co-worker is not adverse employment action); *Gaynor v. Martin,* 77 F.Supp.2d 272 (D.Conn. 1999) (slow processing of discrimination complaint is not adverse employment action on which Title VII claim may be grounded). Therefore, the Court will review this complaint only as it regards the suspension and withheld bonus.

As explained *supra* at 1332, a complaint of discriminatory discipline in the Eleventh Circuit is evaluated under the framework of *Nix,* 738 F.2d at 1185. Plaintiff has satisfied the first two prongs of *Nix* by showing that she is a member of a protected class, and that she was qualified for her former job. As in her complaint of discriminatory discharge, however, this allegation stumbles on the third step of *Nix* because Plaintiff cannot identify any similarly situated employee outside the protected class who received a lesser sanction for conduct nearly identical to that for which Plaintiff was punished.

 Plaintiff was suspended and her bonus denied on the grounds that Defendant concluded she had lied to in-house investigators about the severity of Herren's harassing conduct and the reaction of other employees to it. Plaintiff also had received two prior warnings for what her employer believed to be dishonesty: her personal use of the copier in 1991, and the incident regarding Kim Lyons' absence from work in 1997. By way of comparison, Plaintiff offers only that the other employees who complained about her and disciplined her for these three incidents of dishonesty all lied, yet received no punishment. Ptf. Brf. at ¶ 62.

Besides the fact that one of these proffered comparators (Lyons) is a member of the same protected class as Plaintiff, this argument is nonsensical because it would require the Court to conclude that an employer must punish employees it finds innocent of lying equally with those it finds guilty of lying, or risk a discrimination suit. In none of the comparator cases cited by Plaintiff did Defendant fail to punish an employee who was found to have lied. The only accusation of lying that these comparator employees faced is the one leveled by Plaintiff. This does not place these proffered "comparators" on equal ground with Plaintiff, especially since she fails to allege that any of the purported comparators had a record of two prior disciplinary write-ups for dishonesty, as she did at the time of her suspension.

In sum, because Plaintiff cannot show that any other employee not a member of her protected class received more lenient treatment when accused of conduct similar to that for which Plaintiff was penalized, her claim of discrimination fails and Defendant is entitled to summary judgment.

### 4. Retaliation

Title VII acts to shield employees from retaliation for certain protected practices. Specifically, the statute provides, in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because [the employee or applicant] has opposed any practice made an unlawful practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a). Plaintiff has alleged that Defendant retaliated against her in two ways for protesting Herren's conduct and for filing an EEOC complaint:

by suspending her for thirty days without pay and docking her annual bonus, and ultimately, by firing her.

Proof of retaliation is governed by the same framework of shifting evidentiary burdens established in *McDonnell Douglas* and *Burdine*. *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600 (11th Cir.1986); *see also Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162–63 (11th Cir.1993). To prevail, a plaintiff must first establish a *prima facie* case of retaliation. *Goldsmith*, 996 F.2d at 1162–63; *Donnellon*, 794 F.2d at 600–601; *see also Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1524 (11th Cir.1991) (footnote omitted); *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir.1985). Once a *prima facie* case has been established, the employer must come forward with a legitimate non-discriminatory reason for its action. *Goldsmith*, 996 F.2d at 1162–63; *Donnellon*, 794 F.2d at 600–601; *see also Weaver*, 922 F.2d at 1525–1526. If the employer carries its burden of production to show a legitimate reason for its action, the plaintiff then bears the burden of proving by a preponderance of the evidence that the reason offered by the defendant is merely a pretext for discrimination. *Goldsmith*, 996 F.2d at 1162–63; *Donnellon*, 794 F.2d at 600–601.

### 1. *Prima Facie* Case

To establish a *prima facie* case of illegal retaliation under 42 U.S.C. § 2000e–3(a), Plaintiff must show that: (1) she engaged in a statutorily protected expression; (2) she received an adverse employment action, and (3) there was a causal link between the protected expression and the adverse action. *See, e.g., Wideman v. Wal–Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir.1998); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1524 (11th Cir. 1991) (footnote omitted); *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir.1985). To prevail on a

claim of retaliatory discharge, it is not necessary to show that the discharge itself was the product of discriminatory disparate treatment. *See Taylor v. Runyon*, 175 F.3d 861, 868 (11th Cir.1999) ("Under Title VII, it is well established that an employee need not prove the underlying claim of discrimination in order to establish a retaliation claim."). Rather, it is enough that the discharge was causally linked to a complaint of unlawful discrimination. *Woodson v. Scott Paper Co.*, 109 F.3d 913, 923 (3rd Cir.1997).

#### a) Protected Activity

Plaintiff can satisfy the first element of the *prima facie* case by showing that she engaged in a protected act either of "participation" or "opposition." The participation clause requires the existence of a Title VII proceeding or investigation. *Clover v. Total System Services, Inc.*, 176 F.3d 1346, 1353 (11th Cir.1999); *Reynolds v. Alabama Dept. of Transp.*, 4 F.Supp.2d 1068, 1088 (M.D.Ala.1998). While there was an EEOC proceeding in existence at the time Plaintiff alleges she was discharged in retaliation for filing the first of her two EEOC complaints, there was no Title VII proceeding involving Plaintiff at the time she lost her 1997 bonus and was suspended for thirty days. Thus, while Plaintiff's claim of retaliation in regard to her discharge is, unquestionably, supported by a protected activity (participation in an EEOC proceeding), her retaliation claim with respect to the bonus and suspension must rest on a claim of protected opposition, and is far more tenuous.

Plaintiff contends that her November 5, 1997 e-mail, combined with her subsequent meeting with Taylor, Holliday and Thomas, and her November 8, 1997 letter, constitutes protected opposition. This Court agrees. Voicing concerns to superiors about suspected illegal discrimination qualifies as protected expression. *Holifield v.*

*Reno,* 115 F.3d 1555, 1566 (11th Cir.1997); *see also Rollins v. State of Fla. Dep't. Of Law Enforcement,* 868 F.2d 397, 400 (11th Cir.1989) ("[W]e recognize that the protection afforded by the statute is not limited to individuals who have filed formal complaints, but extends as well to those, like [the plaintiff], who informally voice complaints to their superiors"). Therefore, the Court finds that Plaintiff did engage in protected opposition activity prior to Defendant's decision to revoke her bonus and suspend her.

The Eleventh Circuit has held that an employee who seeks protection under the opposition clause must have a "good faith, reasonable belief" that her employer has engaged in unlawful discrimination. *Clover v. Total System Services, Inc.,* 176 F.3d 1346, 1351 (11th Cir.1999). The objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law. *Id.; Harper v. Blockbuster Entertainment Corp.,* 139 F.3d 1385, 1388 n. 2 (11th Cir. 1998). This standard of reasonableness, however, cannot be identical to the standard applied to assess the merits of the underlying claim, because to hold otherwise would be to require that a plaintiff first be able to prove the underlying case before she could recover for retaliation.

This Court believes that the two objective reasonableness inquiries are distinct because of the stage at which the reasonableness of the Plaintiff's belief is assessed. On motion for summary judgment as to the harassment itself, a court must look at the evidence *as it has been developed through discovery* and ask whether a reasonable employee, given this information, could believe that she was subjected to a hostile work environment. On the other hand, on motion for summary judgment as to retaliation, the proper inquiry is whether, given the level of information available to the Plaintiff *at the time she expressed her opposition,* a reasonable person could have believed that she was opposing unlawful harassment. If so, her activity should properly be found to be a protected activity regardless of whether it is ultimately determined that no reasonable person could find unlawful harassment actually occurred.

This distinction becomes meaningful when applied to the facts at hand, because, at the time of her complaint to management, Plaintiff believed Herren's conduct to have been more egregious than was borne out upon discovery. At the time she complained to Thomas and asked for a security escort, Plaintiff believed that Herren had made the statement to at least one co-worker: "I hate all women and (Plaintiff) is at the top of the list." Complaint at ¶ 11; Ptf. Dep. at 85. Further, Plaintiff believed that, in addition to herself and Walden, a third female co-worker, Lyons, had also received the "silent treatment" from Herren and had expressed fear of him. Ptf. Dep. at 77–78. Based on the testimony of Plaintiff's co-workers during discovery, these beliefs were not well-founded. Plaintiff, however, did not have the benefit of discovery at the time she complained to Thomas. Rather, she was acting on a combination of first-hand observations confirmed by second-hand office rumor. Rumors are, of course, not admissible toward proving a Title VII claim. The Court cannot say, however, that a plaintiff who makes a report of harassment grounded partially in second-hand accounts—particularly where, as here, the rumors are consistent with her own observations and experience—has acted unreasonably. To the contrary, it would be unreasonable to expect an employee who perceived that a co-worker was threatening her to obtain sworn deposition transcripts before reporting the threat to her supervisors. Therefore, the Court finds

that Plaintiff acted reasonably and in good faith when she expressed her opposition to Herren's conduct in November of 1997. As a result, the undersigned concludes that Plaintiff engaged in a protected opposition activity at that time.[13]

To establish the second and third elements of her *prima facie* case of retaliation, Plaintiff must produce evidence that Defendant subjected her to an adverse employment action, and that there was a causal link between her protected activity and the adverse employment action.

### b) Adverse Employment Action

Defendant does not contest that either episode of discipline (Plaintiff's suspension and bonus loss or her dismissal) qualifies as an adverse employment action. While it is beyond dispute that termination is the prototypical "adverse employment action," the Eleventh Circuit has held that adverse employment actions are not limited to such ultimate employment decisions. *Wideman v. Wal–Mart Stores, Inc.,* 141 F.3d 1453, 1456 (11th Cir.1998). In *Wideman,* the court found that a series of reprimands and other negative treatment of an employee who had filed an EEOC charge could, taken together, constitute adverse employment action for the purposes of presenting a *prima facie* case of retaliation under Title VII. *Id. See also Naia v. Deal,* 13 F.Supp.2d 1369 (S.D.Ga.1998) (two-week unpaid suspension, plus six-month probation and written reprimand, constitute adverse employment action for purposes of discrimination complaint). Therefore, the suspension and bonus loss, as well as Plaintiff's dismissal, constitute adverse employment actions.

### c) Causal Link

For the third element of her *prima facie* case of retaliation, Plaintiff must establish that there is a causal link between her protected activity and the adverse employment action. Plaintiff is not required to establish "the sort of logical connection that would justify a prescription that the protected participation in fact prompted the adverse action. Such a connection would rise to the level of direct evidence of discrimination, shifting the burden of persuasion to the defendant." *Simmons v. Camden County Bd. of Educ.,* 757 F.2d 1187, 1189 (11th Cir.1985); *see also Hairston v. Gainesville Sun Pub. Co.,* 9 F.3d 913, 920 (11th Cir.1993); *Weaver v. Casa Gallardo, Inc.,* 922 F.2d 1515, 1525 (11th Cir.1991). Rather, Plaintiff can satisfy the third element merely by presenting evidence that her protected activities and the subsequent adverse employment actions are not totally unrelated. *Simmons,* 757 F.2d at 1189; *see also Hairston,* 9 F.3d at 920; *Weaver,* 922 F.2d at 1525.

In order to establish a causal connection between protected conduct and an adverse employment action, however, "[a]t a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment action." *Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 (11th Cir.1993); *see also Weaver,* 922 F.2d at 1525. The defendant's awareness of the protected statement, however, may be established by circumstantial evidence. *Goldsmith,* 996 F.2d at 1163 (citations omitted). There is no dispute here that Defendants were aware of Plaintiff's November 1997 e-mail, and sub-

---

**13.** For an example of a case striking such a distinction, see *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 769 (2nd Cir.1998) (upholding summary judgment on hostile work environment claim but allowing Plaintiff to proceed to trial on retaliatory discharge claim, because testimony as to two arguments in which co-workers used offensive sexual terms, while inadequate to support finding of hostile environment, was sufficient to support good-faith belief at the time harassment complaint was filed).

sequent oral and written complaints, at the time they levied the suspension and bonus reduction; indeed, the content of the e-mail and Plaintiff's subsequent statements were the basis for those actions. Likewise, there is no dispute that Defendants were aware not only of this internal opposition but of the January 7, 1998, EEOC complaint at the time they decided to terminate Plaintiff.

There is close temporal proximity between the challenged suspension and bonus elimination (imposed on December 16) and the protected activity (Plaintiff's November 5 and 18 letters and the November 6 meeting with management). As Defendant acknowledges, the content of the protected activity was itself the direct cause of the disciplinary action; the only dispute is over which aspect of the opposition (the fact that some of it was true, or the fact that some of it was false) was the provocation. Where the temporal connection between the protected activity and the discipline is sufficiently strong, it can suffice to show the two are causally related. *See Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 601 (11th Cir.1986) (one-month gap between filing of EEOC complaint and termination was sufficient to carry plaintiff's initial burden of showing causal connection); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2nd Cir.1998) (employee satisfied causal connection requirement by showing she was discharged two months after filing sexual harassment complaint with employer, and ten days after lodging same complaint with state agency); *Anderson v. Twitchell–A Tyco Int'l Ltd. Co.*, 76 F.Supp.2d 1279, 1289 (M.D.Ala.1999) (showing that employee was fired two days after complaining to supervisor about her travel pay was sufficient, standing alone, to establish causal connection); *Mills v. Amoco Performance Prod., Inc.*, 872 F.Supp. 975, 990 (S.D.Ga. 1994) (two-month gap between filing of EEOC complaint and disciplinary action is

sufficient to raise triable issue of fact as to causal connection). Plaintiff has met this burden here as to the suspension and bonus.

The temporal link is far weaker, however, between Plaintiff's dismissal in June 1998 and the protected opposition of November 1997 or the protected participation of January 1998. A seven-month, or even five-month, lapse of time is too lengthy to support an inference of cause-and-effect by itself. *See, e.g., Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997) (four-month gap between protected activity and termination not sufficient to justify an inference of causation); *Balletti v. Sun–Sentinel Co.*, 909 F.Supp. 1539, 1548 (S.D.Fla.1995) (plaintiff's internal company complaint of sexual harassment, followed six months later by her discharge, "was not temporally close enough to support an inference of causal connection"). In fact, a gap of this duration may give rise to the opposite inference, that the dismissal was *unrelated* to the protected activity. *See Smith v. St. Louis Univ.*, 109 F.3d 1261, 1266 (8th Cir.1997) (four-month lapse between Plaintiff's complaint and retaliatory act "weakens the inference of retaliation that arises when a retaliatory act occurs shortly after a complaint").

While the burden of showing causal connection is a light one at the prima facie case stage, the Court questions whether a five-to-seven-month time interval, supported by nothing but Plaintiff's testimony as to her own suspicions, is sufficient to meet it. This is especially true where, as Defendant notes, there is no dispute that Defendant could have fired Plaintiff outright in 1997 when the results of the internal investigation came back, rather than merely suspending her and revoking her bonus. Nevertheless, the Court finds it unnecessary to decide this issue, because Defendant has introduced a legitimate,

nondiscriminatory reason for Plaintiff's dismissal, and Plaintiff has failed to raise an issue as to whether this reason is a pretext.

### 2. Defendant's Legitimate Nondiscriminatory Reason

Defendant submits that Plaintiff was suspended and lost her 1997 bonus because she made a factually false charge against a co-worker after having been warned twice (once after the 1991 copier episode and once after the 1997 Lyons incident) that any dishonesty could be grounds for severe disciplinary action. Defendant further submits that Plaintiff was terminated because she deliberately injured a co-worker by poking her in the face. These constitute legitimate, nondiscriminatory grounds for the two actions. As in a Title VII discrimination suit, Defendant's burden at this stage of a retaliation claim is an exceedingly light one. *Meeks v. Computer Assoc's Int'l*, 15 F.3d 1013, 1021 (11th Cir.1994). The Court finds it amply satisfied here.

### 3. Pretext

Plaintiff contends that the explanations offered by Defendant are not the genuine reasons for which she was disciplined and, ultimately, dismissed. In examining Defendant's explanation for the suspension and bonus revocation, the Court is guided by the Fourth Circuit's decision in *Kubicko v. Ogden Logistics Svcs.*, 181 F.3d 544 (4th Cir.1999). In *Kubicko*, the Fourth Circuit reversed a grant of summary judgment to the Defendant/employer on a charge of unlawful retaliation for opposing sexual harassment in violation of Title VII. The plaintiff, an aerospace logistics engineer, was fired after helping a subordinate pursue a sexual harassment claim against Plaintiff's supervisor. At a meeting where the harassment complaint was being discussed, one of Plaintiff's superiors stated that the harassment investi-

gation should be closed and "if anyone needed to be terminated, it was (Plaintiff)," because he assisted in pressing a bogus claim. The Fourth Circuit found evidence that Plaintiff's superiors did not legitimately believe that the harassment allegations were bogus, and held that, in such circumstances, summary judgment on the retaliation claim was inappropriate.

The Court finds *Kubicko* a close fit to the facts at hand. Here, as in *Kubicko*, Plaintiff has presented sufficient evidence to support a finding that Defendants did not believe in good faith that her claims were fabricated. First, Plaintiff has shown that Defendants had no evidentiary support for at least some of the conclusions of their in-house investigation. Shari Cohen's notes of her interview with Connie Walden, *see* Cohen Dep., Ex. 1 at 001439, indicate that Walden stated that she thanked Plaintiff for bringing Herren's conduct to the attention of management. Walden testified in this proceeding that she thanked Plaintiff for bringing Herren's behavior "out in the open." Walden Dep. at 62. Nevertheless, Defendant concluded that Plaintiff lied about having been thanked by Walden, and this conclusion became part of the basis for disciplining Plaintiff.

Second, Plaintiff has introduced evidence supporting her contention that Defendants' investigators set out to disprove Plaintiff's allegations to the last semantic detail, rather than to determine whether the charges were substantively true. Walden testified that Taylor, in the course of his initial investigation, attempted to dissuade her from using the word "intimidating" to describe Herren, to the point of calling her back twice to give her a chance to change her mind. Walden Dep. at 23, 64. Even after Walden stuck to her use of the word "intimidating," and even after another employee, Scott Pickard, told in-

vestigators that he felt "threatened" if Herren learned he was assisting the investigation,[14] Plaintiff's evidence indicates that Defendants applied a technical, legalistic definition of the term "threatened" to support their finding that Plaintiff's complaint was factually false. *See* Cohen Dep. at 35–36, Taylor Dep. at 48–49.[15] Combined with Plaintiff's testimony that Taylor angrily sloughed off her two initial reports of misconduct by Herren, Ptf. Dep. at 181, this evidence is sufficient to raise a jury question as to whether Defendant's proffered reason for suspending Plaintiff and taking away her bonus was pretextual.[16]

Defendant points the Court to the Eleventh Circuit's recent decision in *EEOC v. Total System Svcs., Inc.*, 221 F.3d 1171 (11th Cir.2000), for the proposition that an employer who concludes that an employee/witness lied during an internal investigation of sexual harassment may terminate that employee without violating the anti-retaliation provisions of Title VII. While the situation in *Total System* superficially resembles the facts here, important differences make its holding inapplicable. Most significantly, the court in *Total System* found no evidence indicating that Defendant lacked a good-faith belief in its conclusion that the Plaintiff had concocted evidence of sexual harassment. Here, Plaintiff has advanced such evidence. Additionally, the employer in *Total System* fortified its good-faith belief by producing evidence that the Plaintiff had pressured a co-worker to confirm her false account of harassment. *See id.* at 1173. Here, the evidence supports the opposite conclusion; it is Plaintiff who has introduced evidence that Defendant pressured a witness to change her story.

This Court is in complete agreement with the essential legal principle reiterated in *Total System*—that an employer need not prove that an employee actually lied in an internal investigation to prevail in a Title VII retaliation case, so long as the employer can show that it had a good-faith belief that the employee made a knowingly false statement. *Id.* at 1175. Because the Court finds that Plaintiff here has raised a jury question as to the existence of that good-faith belief, however, summary judgment on the retaliation claim is inappropriate as to the suspension and bonus.

14. *See* Cohen Dep. at 26.

15. While Plaintiff fails to cite this testimony in her brief in opposition to summary judgment, the Court notes that a second witness, Pickard, also attested to Taylor's efforts to persuade him that Plaintiff was a liar whose complaints could not be trusted. *See* Pickard Dep. at 24–25. This reinforces Plaintiff's contention that Defendants did not enter into the investigation with the good-faith purpose of seeking the truth but, rather, with the purpose of catching Plaintiff in a lie.

16. Plaintiff's potential recovery would appear to be limited given the Court's recommendation that a jury question exists only as to the suspension and bonus loss, not the dismissal. The Court observes, however, that Plaintiff requested punitive damages in her complaint, and that such damages are available in a Title VII retaliation case under

42 U.S.C. § 1981(a)(b)(1) if Plaintiff can show that Defendant acted with malice or reckless indifference to her federally protected right to be free of retaliation. *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999); *see also Blackmon v. Pinkerton Security & Investigative Svcs.*, 182 F.3d 629, 636 (8th Cir.1999) (where Defendant conducted sham investigation into harassment charges that consisted almost exclusively of looking for unfavorable information about Plaintiff/employee, evidence supported a finding of malice or reckless indifference to Plaintiff's rights, so as to support award of punitive damages); *Baty v. Willamette Indus., Inc.*, 172 F.3d 1232, 1244–45 (10th Cir.1999) (punitive damages appropriate where reasonable jury could infer that Defendant conducted sham investigation of harassment charges to appease Plaintiff and that Defendant's managers actually condoned harassment).

Plaintiff has failed, however, to introduce evidence sufficient to support a finding that the proffered reason for her dismissal was pretextual. As discussed *supra* at 1333–34, Plaintiff's evidence suggests, at most, that Denise Clark's injury from their confrontation was not as severe as Clark reported it to be. The evidence does not, however, indicate that Defendant had any reason to doubt Clark's sincerity. It is not necessary for Defendant to show that the factual basis for its disciplinary action is true; it is sufficient that Defendant had a good-faith belief in the stated grounds for the discipline when it was imposed. A plaintiff alleging pretext cannot prevail if the defendant honestly believed in the non-discriminatory reasons it offers, "even if the reasons are foolish or trivial or even baseless." *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 396 (7th Cir.1998). Moreover, Plaintiff admits to the essential fact of Clark's complaint—that Plaintiff touched her in an unwelcome manner. Whether Defendant is wise to maintain and strictly enforce a "no-touching" policy is not before this Court; the reasonableness of an employer's disciplinary policies are not a consideration in a suit alleging discriminatory treatment. *Abel v. Dubberly*, 210 F.3d 1334, 1339 n. 5 (11th Cir.2000). Therefore, Defendant is entitled to summary judgement as to the retaliatory discharge claim.

### III. *RECOMMENDATION*

For all the above reasons, **IT IS RECOMMENDED** that Defendant's Motion for Summary Judgment [15] be **GRANTED** as to Defendant Norfolk Southern Railway Co. (NSRC), and that judgment be entered in favor of Defendant NSRC as to all counts of Plaintiff's complaint, and **GRANTED IN PART and DENIED IN PART** as to Defendant Norfolk Southern Corporation (NS), and that judgment be entered in favor of Defendant NS on Counts One and Two of Plaintiff's complaint.

November 13, 2000.